## In re LIVENT, INC. SECURITIES LITIGATION.

**This document relates to all actions.**

### No. 98 CIV. 5686(VM).

United States District Court,
S.D. New York.

June 29, 2001.

*DECISION AND ORDER*

MARRERO, District Judge.

**TABLE OF CONTENTS**

Page

I. *BACKGROUND* 335

II. *THE PARTICULARS OF THE ALLEGED FRAUD* 336

A. FRAUDULENT "REVENUE–GENERATING" TRANSACTIONS ............... 336
 1. Pace Theatrical Group ............................................... 336
 2. American Artists ................................................... 336
 3. CIBC Wood Gundy Capital ............................................ 337
 4. Dundee Realty Corporation .......................................... 337
 5. Pantages Theatre Naming Rights ..................................... 339
 6. Dewlim Investments Limited ......................................... 340
B. FRAUDULENT MANIPULATION OF LIVENT'S BOOKS AND RECORDS ..... 341
C. OTHER FRAUDULENT CONDUCT ........................................... 344
 1. The Undisclosed Kickbacks .......................................... 344
 2. Materially False and Misleading Statements to Analysts ............. 344
 3. Fraudulent Ticket Purchases ........................................ 344
D. ALLEGATIONS OF MISCONDUCT SPECIFIC TO D & T .................... 345
E. ALLEGATIONS OF MISCONDUCT SPECIFIC TO CIBC ..................... 345
F. LIVENT'S BANKRUPTCY ................................................. 346

III. *THE SECURITIES LAWS* 347

A. SECTION 10(b) AND SEC RULE 10b–5 .................................... 347
B. SECTION 20(a) ....................................................... 351
C. THE 1995 REFORM ACT ................................................. 355
 1. Pleading Standards ................................................. 355
 2. Policy and Procedural Objectives ................................... 360

IV. *DISCUSSION* 364

A. CIBC's MOTION ....................................................... 364
 1. Statute of Limitations ............................................. 364
 2. Failure to Plead Loss Causation .................................... 365
B. D & T'S MOTION ...................................................... 366
 1. Scienter ........................................................... 366
 2. The Magnitude of the Fraud ......................................... 367
 3. Livent's Fraudulent Revenue–Generating Transactions ............... 368
 a. The Dundee Transaction ........................................... 369
 b. CIBC Wood Gundy Transaction ...................................... 369
 4. Livent's Manipulation of Its Books and Records ..................... 370

C. OUTSIDE DIRECTORS' MOTION ........................................371
 1. Section 10(b) Claims ................................................371
 2. Section 20(a) Claims................................................372

### V. *ORDER* 373

This case is one of numerous securities class actions that arose out of the events surrounding the collapse of Livent, Inc. ("Livent"). The particular action now before the Court is brought on behalf of Livent stockholders who purchased or otherwise acquired Livent common stock between March 5, 1996 and August 7, 1998 (the "Class Period") and has been the subject of a prior published decision of this Court, *In re Livent Sec. Litig.*, 78 F.Supp.2d 194 (S.D.N.Y.1999) (Sweet, J.) ("Livent Shareholders I"), familiarity with which is assumed.[1]

### I. *BACKGROUND*

In August 1998, the first of many shareholder actions was brought against Livent and associated individuals and entities. In December 1998, Judge Sweet consolidated the pending actions and approved lead plaintiffs and counsel. In February 1999, plaintiffs herein ("the Shareholders") filed an amended class action complaint against several groups of defendants: Livent's two highest officers, Garth Drabinsky and Myron Gottlieb (the "Inside Directors"); three directors who served on Livent's audit committee, H. Garfield Emerson, A. Alfred Taubman, and Martin Goldfarb (the "Outside Directors" or "Audit Committee"); and Livent's accounting firm, Deloitte & Touche Chartered Accountants ("D & T").

The defendants moved to dismiss on various grounds. In December 1999, Judge Sweet held that: (1) dismissal of the action on forum non conveniens grounds was not warranted; (2) allegations of fraudulent conduct by Drabinsky and Gottlieb were sufficiently particular to state securities fraud claims; (3) the magnitude of alleged accounting fraud was insufficient to infer scienter on the part of D & T; (4) the allegations that the Outside Directors, who as members of the Audit Committee failed to discover various fraudulent schemes by the Inside Directors, were insufficient to plead scienter; and (5) the fact that the Outside Directors were members of the Audit Committee was insufficient to establish that such directors had the control required to satisfy the criteria for "control person" liability under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) (the "Exchange Act" or "1934 Act").

Judge Sweet granted leave to re-plead, and in February 2000, the Shareholders filed the Second Amended Consolidated Class Action Complaint ("SH SAC") now before the Court. Among its changes, the SH SAC for the first time named Canadian Imperial Bank of Commerce ("CIBC"), a major Livent lender and investment banker, as a defendant.

In three separate motions, D & T, CIBC, and the Outside Directors now move to dismiss the SH SAC under Fed. R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995, (the "PSLRA" or the "1995 Reform Act"), Pub.L. No. 104–67, 109 Stat. 737 (1995) (codified at 15 U.S.C. §§ 77z1–77z2, 78u4–

---

1. By separate Decision and Order issued simultaneously with this Decision and Order, the Court ruled on motions filed in related cases brought by Livent noteholders grounded on essentially the same events. *See* Decision and Order, *In re Livent Noteholders Sec. Litig.*, 2001 WL 740673 (S.D.N.Y.2001).

78u5), for failure to plead fraud with particularity and under Rule 12(b)(6) for failure to state a claim for which relief can be granted. For the reasons that follow, the motions are denied in part and granted in part.

## II. *THE PARTICULARS OF THE ALLEGED FRAUD*

The circumstances upon which the Shareholders' claims of fraud are grounded generally fall into two categories; first, certain transactions Livent executed, the accounting for which overstated income; and second, manipulation of Livent's books and records that understated expenses. Some of the claims target the roles of particular defendants in the underlying the events.

## A. *FRAUDULENT "REVENUE–GENERATING" TRANSACTIONS*

### 1. *Pace Theatrical Group*

In 1996 and 1997, Livent purported to sell Pace Theatrical Group, Inc. ("Pace"), a Texas-based theatrical company, the exclusive rights to present "Show Boat" and "Ragtime" in various theaters in North America for fees totaling $11.2 million (U.S.). SH SAC ¶ 50. These agreements, contained in contracts or letters, were dated June 15, 1996 and August 8, 1997, with respect to "Show Boat," and December 18, 1996 and August 8, 1997, with respect to "Ragtime." SH SAC ¶ 50. In return for payment of the fees, Pace was to be reimbursed for all theater expenses to present the shows and was entitled to a limited percentage of adjusted gross ticket sales as profit participation. SH SAC ¶ 50. All of these agreements purported to make

the fees nonrefundable, even if Livent never made the shows available to Pace.[2]

The Shareholders allege that pursuant to the terms of the agreements, Livent would not commence staging "Show Boat" until July 1997 and would be responsible for all production costs, running costs and moving costs throughout the tour. SH SAC ¶ 52. Similarly, according to the Shareholders, Livent assumed obligations with respect to the "Ragtime" agreement for substantial performance that would extend beyond 1996 and 1997. SH SAC ¶ 53.

Nevertheless, on the basis of these agreements, and allegedly in violation of Generally Accepted Accounting Principles ("GAAP"), Livent recognized the present value of the fees as revenue in its financial statements in the amounts of $12.2 million for fiscal 1996 and $1.6 million for fiscal 1997. SH SAC ¶ 51. For purposes of Livent's year-end 1996 reconciliation to U.S. GAAP, Livent deferred recognition of $6 million related to the sale of rights to "Ragtime." SH SAC ¶ 51. Livent subsequently improperly recognized that amount in fiscal 1997. SH SAC ¶ 51.

### 2. *American Artists*

In 1997, pursuant to an agreement dated September 9, 1997, Livent sold American Artists Limited Inc. ("American Artists"), a Massachusetts-based theater owner and operator, the right to present "Ragtime" in three theaters for a fee of $4.5 million (U.S.). SH SAC ¶ 86. The agreement purported to make the fee nonrefundable, regardless of whether Livent made "Ragtime" available to American Artists. SH SAC ¶ 86.

The Shareholders allege that the American Artists contract contained terms which

---

**2.** The Shareholders amended their complaint to remove this allegation, but they nevertheless rely on the allegation in their Brief in

Opposition to Defendants Emerson, Goldfarb, and Taubman's Joint Motion to Dismiss, (dated May 26, 2000) ("SH Opp. Br.") at 15.

made it clear that Livent could not fulfill all significant obligations in 1997, so that the full amount of revenue should not have been recognized in 1997. SH SAC ¶ 86.

### 3. *CIBC Wood Gundy Capital*

In December 1997, Gottlieb negotiated an agreement purporting to memorialize the sale of an interest in the production rights of "Show Boat" and "Ragtime" in the United Kingdom and other countries to CIBC Wood Gundy, an investment bank and subsidiary of CIBC, Livent's principal banker. SH SAC ¶ 87. In return, CIBC Wood Gundy was entitled to certain royalty payments from the shows. SH SAC ¶ 87. Valued at $4.6 million (Can.) or £2 million, the agreement also gave Livent the right, until June 30, 1998, to repurchase the production rights. SH SAC ¶ 87. Based on this agreement, Livent recorded revenue of approximately $4.6 million (Can.) in its financial statements for fiscal 1997. SH ¶ 87.

According to the Shareholders, the CIBC Wood Gundy contract was reviewed by D & T as part of its 1997 audit of Livent. Although fully aware that the contract required Livent to perform over a period of years, D & T allegedly acquiesced to Livent's insistence that all revenue be booked in 1997—so long as a corresponding amortization liability was also recorded. SH SAC ¶ 87. Thus, the transaction inflated revenue and earnings before interest, taxes, depreciation and amortization (EBITDA), but not earnings, net interest, taxes, depreciation and amortization. SH SAC ¶ 87.

Gottlieb purportedly negotiated a side letter with CIBC Wood Gundy. SH SAC ¶ 90. The side letter provided two mechanisms for CIBC Wood Gundy to recoup its fees and make significant profits. If Livent exercised the repurchase option, Livent would repay all fees, plus £112,500,

plus any unpaid royalties; if Livent did not exercise the repurchase option, Livent would pay CIBC Wood Gundy an additional royalty equal to 10 percent of the adjusted gross weekly ticket sales of the Broadway production of "Ragtime." SH SAC ¶ 90. Under this arrangement, CIBC Wood Gundy was guaranteed a minimum of an annualized 33 percent return on its original investment, regardless of which option Livent chose. SH SAC ¶ 90.

The transaction was designed to provide Livent with "bridge" financing until it could sell the production rights to a U.K. investor after "Ragtime" opened on Broadway in early 1998. SH SAC ¶ 91. When it became clear in early August 1998 that Livent's new management did not know about the side agreements, Gottlieb asked the managing director of CIBC Wood Gundy who negotiated the transaction not to disclose the side agreements to new management so that Gottlieb could cause Livent to repurchase the rights from CIBC Wood Gundy. SH SAC ¶ 91.

### 4. *Dundee Realty Corporation*

In May 1997, Livent acquired from the City of Toronto title to lands adjoining the Pantages Theater (the "Pantages Place Lands"). SH SAC ¶ 66. A portion of the Pantages Place Lands were to be used for a new theater, an underground parking garage, and retail space (collectively the "Pantages Place Project"). SH SAC ¶ 66.

Drabinsky and Gottlieb advised the Board that at the end of the second quarter of 1997, Livent had sold the development rights over the land not used by the Pantages Place Project for $7.4 million (Can.) to a third-party, Dundee Realty Corporation ("Dundee"), a Canadian company. SH SAC ¶¶ 67–68. Gottlieb was a director and shareholder of Dundee's parent corporation, Dundee Bancorp Inc. SH SAC ¶ 67. Livent failed, however, to dis-

close this agreement as a related party transaction in its fiscal 1997 annual report. SH SAC ¶ 67. The purpose of this sale was to enable Dundee to construct a hotel and condominium adjacent to the Pantages Place Project. SH SAC ¶ 67. Livent was also to receive a minority interest in the development company owned by Dundee that was to construct the hotel and condominium. SH SAC ¶ 67.

Under the master agreement for the project, dated June 30, 1997, Livent and Dundee created a joint venture company. SH SAC ¶ 68. However, the parties entered into a related "Put" agreement (the "Put Agreement") that entitled Dundee to withdraw from the project and cause the joint venture, and therefore Livent, to repay Dundee's investment. SH SAC ¶ 68.

In August 1997, the Audit Committee questioned Gottlieb about the timing of the transactions and whether revenue had been properly recognized for the second quarter of FY 1997. SH SAC ¶ 70. According to the Shareholders, under GAAP, the Put Agreement created a material contingency preventing recognition of the $7.4 million as income in 1997. SH SAC ¶ 77. Over Drabinsky's objections, D & T was asked for an opinion with respect to revenue recognition. SH SAC ¶ 70. Peter Chant ("Chant") of D & T reviewed the contract and opined that, because the contract contained a "put" agreement that would require Livent to buy back the same rights at Dundee's request, the sale was not final and revenue should not be recognized. SH SAC ¶ 70.

Gottlieb then represented to the Board and D & T that the Put Agreement had been cancelled. SH SAC ¶¶ 71, 77. On this basis, D & T informed Gottlieb that because the Put Agreement had been removed in August 1997, revenue should be recognized only in the third quarter. Gottlieb ignored this advice, and issued a press release stating revenue for the second quarter which included the development rights revenue. SH SAC ¶ 71.

When Bob Wardell ("Wardell") of D & T learned of the press release, he contacted Gottlieb and demanded a meeting with Livent's Audit Committee. SH SAC ¶ 72. At the meeting, Gottlieb explained that in his opinion the Dundee contract had been finalized in the second quarter, and he would procure confirmation from Dundee and an opinion of counsel supporting his position. SH SAC ¶ 72.

A few days later, at a second special meeting of the Audit Committee with D & T present, Gottlieb presented the legal opinion and purported confirmation from Dundee. SH SAC ¶ 73. Nonetheless, D & T initially refused to accept the accounting treatment and threatened to resign. The D & T representatives then stepped out of the room. SH SAC ¶ 73.

Gottlieb then told the Audit Committee that D & T should resign. Goldfarb said that would be unacceptable and that D & T's resignation would cause too much damage to Livent's reputation. SH SAC ¶ 74. After further discussion, the Board members agreed that they would be willing to reverse the revenue recognition, provided some of the revenue could be made up for in the second quarter, and that a corrective press release could be issued in a manner that saved face. SH SAC ¶ 74.

Chant and Wardell then came back in the room and the parties agreed that Livent would reverse the $6 million revenue line, but would also increase other revenue by $1.2 million, by reversing an assortment of accrued liabilities. SH SAC ¶ 75. Livent then issued a press release, which, according to the Shareholders, D & T "accepted," and which stated in part that "Livent, Inc. . . . has adjusted its accounting treatment for non-theatre real estate

transactions to be consistent with U.S. GAAP." SH SAC ¶ 75.

The Put Agreement issue rose again in discussion with the Audit Committee during the year-end audit in April 1998. SH SAC ¶ 77. On April 9, 1998, Gottlieb expressly stated to the Audit Committee that no such agreement or arrangement existed and provided a letter from the Chairman of Dundee as confirmation. SH SAC ¶ 78–79. However, in a letter dated April 6, 1998 to Dundee's President, Drabinsky and Gottlieb confirmed to Dundee that the Put Agreement was in place and effective as between Livent and Dundee. SH SAC ¶ 79. The letter read in pertinent part as follows: "[W]e wish to confirm that notwithstanding [Dundee's Chairman's] letter to me of April 4, 1998, a copy of which is attached hereto, the "PUT" agreement referred to in [Dundee's Chairman] letter is binding and effective and remains so in favor of Dundee . . . as if it had never been cancelled." SH SAC ¶ 79.

The Shareholders allege that revenue recognition from this transaction violated GAAP. First, according to the Shareholders, any oral agreement to cancel the Put Agreement was contingent upon Gottlieb renegotiating the joint venture agreement to ensure to Dundee's satisfaction that Dundee's rights remained secure. SH SAC ¶ 80. Thus, even if the Put Agreement was cancelled, recognition of revenue was improper because the contract was not a final, consummated sale. Second, On May 27, 1998, Gottlieb and Dundee executed a new Put agreement. SH SAC ¶ 80. Gottlieb and Drabinsky's April 6, 1998 letter "reinstating" the Put Agreement, and the new May 27, 1998 Put agreement confirm that Gottlieb and Drabinsky considered it to be binding on Livent. SH SAC ¶ 80. Accordingly, the existence of the Put Agreement made the transaction an investment that did not qualify for revenue recognition under GAAP. SH SAC ¶ 80.

### 5. *Pantages Theatre Naming Rights*

Livent sought to recognize as revenue $12.5 million for a purported sale of naming rights to the Pantages Theatre to AT & T for the third quarter of fiscal 1997. SH SAC ¶ 81. Livent purportedly sold AT & T the right to add its name on two theaters, one of which had not yet been built. SH SAC ¶ 81. Although there had not been any firm contract by the end of the third quarter, Livent wanted to record the revenue immediately based on its plans to allow the name change to the Pantages. SH SAC ¶ 81.

In October 1997, Livent vice-president Maria Messina ("Messina") discussed the transaction with D & T's Wardell and Chant, and all three agreed that the revenue could not be recognized in the third quarter of 1997. Gottlieb, an accountant by profession, retained Ernst & Young ("E & Y") for the purpose of receiving an independent opinion on the naming revenue. SH SAC ¶ 82. While E & Y would not opine that the revenue could be recognized in the third quarter of 1997, it did state that the transaction could be considered within the third quarter. SH SAC ¶ 83. Gottlieb provided D & T with E & Y's opinion regarding the transaction and asked that it be included in the accounting for the third quarter. SH SAC ¶ 83.

D & T retained another accounting firm, Price Waterhouse, for another professional opinion. Price Waterhouse met with Gottlieb and AT & T and concluded that an oral contract could be considered to have occurred in the third quarter of 1997. SH SAC ¶ 84. Price Waterhouse did not opine on the specific issue of revenue recognition with respect to the oral contract. SH SAC ¶ 84.

After receiving this information, D & T acquiesced to recording the naming revenue in the third quarter. SH SAC ¶ 85. The written contract for the name change was thereafter signed in November 1997. SH SAC ¶ 85.

### 6. *Dewlim Investments Limited*

In 1996, Gottlieb negotiated the sale of an interest in the production rights to "Show Boat" in Australia and New Zealand to Dewlim Investments Limited ("Dewlim"), a British Virgin Islands company, for $4.5 million. SH SAC ¶ 54. The original agreement was dated October 21, 1996, and revised by agreement dated November 3, 1997. SH SAC ¶ 54.

In October 1996, Gottlieb and Drabinsky orally promised Dewlim's then owner, Andrew Sarlos, that Livent would repay the fee Dewlim advanced for the production rights, plus 10 percent interest. SH SAC ¶ 55. This arrangement is memorialized in a June 9, 1998 memo from Gottlieb to Drabinsky. SH SAC ¶ 55. It states that as "an inducement" for the "Show Boat" transaction, "we committed to Dewlim on behalf of Livent that Dewlim would recoup by December 31, 2000 all capital together with interest accrued monthly at the rate of 10% per annum." SH SAC ¶ 55. As a result of this concealed arrangement, Livent improperly recorded as revenue the present value of the fee, $4.2 million, in fiscal 1996; no revenue was recorded under U.S. GAAP in fiscal 1996 or 1997. SH SAC ¶ 55.

This was a related party transaction in two respects. First, at the time of the transaction, Sarlos was a director of Livent and chairman of Livent's Audit Committee. SH SAC ¶ 56. Additionally, in October 1996, Gottlieb had pledged his personal Livent stock to Dewlim as security for the $4.5 million loan. SH SAC ¶ 56. Neither of these related party transactions

was disclosed in Livent's annual report for fiscal 1996 or 1997. SH SAC ¶ 56.

According to the Shareholders, even a cursory examination of the Dewlim agreement—even without the side agreement—raised red flags that Livent could not complete its terms of the agreement to justify the recognition of $4.2 million in 1996.

The Audit Committee reviewed the contents of the Dewlim and Pace agreements. SH SAC ¶ 59. During one Audit Committee meeting Goldfarb and Emerson stated that the revenue recognition in the agreements was improper, and some revenues should be amortized over several years. SH SAC ¶ 59. However, based on a report by D & T and representations of management, they agreed that the revenue could be recognized in 1996. SH SAC ¶ 59.

D & T also reviewed the terms of the Dewlim and Pace agreements, and knew that Messina opposed recognizing all the revenue on the agreements. SH SAC ¶ 60.

D & T's United States affiliate initially refused to permit D & T to file its Audit Opinion on Livent's 1996 U.S. GAAP financial statement with the SEC, because it agreed with Messina that revenue recognition had been improper with respect to those transactions. SH SAC ¶ 60. A meeting was held in New York in early 1998 to consider the proper accounting. Livent was represented by Drabinsky, Gottlieb, and Livent vice-presidents Robert Topol ("Topol"), Gordon Eckstein ("Eckstein"), and Messina and D & T Canada was represented by Wardell and Chant. SH SAC ¶ 61. D & T New York was represented by four partners. SH SAC ¶ 61.

At the meeting, the parties once again reviewed the agreements. SH SAC ¶ 62. A compromise was reached whereby the

U.S. GAAP financial statements would recognize all of the revenue from the Pace "Show Boat" agreement at the time of signing, but could not recognize the revenue from the Pace "Ragtime" transaction until 1997. SH SAC ¶ 62. The revenue from the Dewlim agreement would not be recognized on U.S. GAAP financial statements. SH SAC ¶ 62. D & T based this decision on the fact that pre-production had begun for the Pace "Show Boat" production, but had not begun for "Ragtime" or for the Dewlim "Show Boat" production. SH SAC ¶ 62. The Canadian GAAP filings would not be restated or amended. SH SAC ¶ 62.

## B. FRAUDULENT MANIPULATION OF LIVENT'S BOOKS AND RECORDS

The Shareholders allege that beginning in 1994 and continuing through the first quarter of 1998, Drabinsky and Gottlieb and several of the other Livent officials engaged in a deliberate manipulation of Livent's books and records, thereby understating expenses in each fiscal quarter in order to inflate earnings, and violating GAAP. By redacting expenses on losing shows, Drabinsky and Gottlieb were able to portray the productions and Livent as financially successful. SH SAC ¶ 105. In quarterly periods, this enabled Drabinsky, Gottlieb and Topol to meet the earnings and operating projections provided to Wall Street analysts. SH SAC ¶ 105.

Specifically, the Shareholders claim that Livent's managers engaged in three manipulative devices to falsify Livent's books: (a) transferring preproduction costs for shows to fixed asset accounts, which materially understated expenses; (b) physically erasing expense and liability entries from the Company's general ledger; and (c) transferring costs from a currently running show to another show with a longer amortization period, which again materially understated expenses. SH SAC ¶¶ 96–114.

Livent transferred preproduction costs for shows to fixed asset accounts. SH SAC ¶ 96. Preproduction costs, such as costs for advertising, sets and costumes, were incurred prior to the opening of a production. SH SAC ¶ 96. According to Livent's accounting policies, preproduction costs were amortized, and thus expensed, once a production begins and only for a period not to exceed five years. SH SAC ¶ 96. Fixed assets, in contrast, were depreciated over their useful life, not to exceed forty years. SH SAC ¶ 96. As a result, Livent significantly decreased expenses, and thus inflated its reported income, by improperly depreciating preproduction costs over a much longer period of time. SH SAC ¶ 96. For example, in 1997 Livent transferred preproduction costs and certain show operating expenses totaling $15 million, representing six different shows in 30 different locations, to three different fixed asset accounts. SH SAC ¶ 96. By this manipulation, Livent violated GAAP and its own accounting policy. SH SAC ¶ 96.

Livent also physically erased expense and liability entries from its general ledger, moving these entries from the current quarter to future periods. SH SAC ¶ 97. Livent maintained a separate set of books, called the "Expense Roll," that internally tracked the amount of these eliminated entries. SH SAC ¶ 98. This manipulation allowed Livent to falsely report significant reductions in show expenses, with attendant increases in profits. SH SAC ¶ 98. For example, expenses rolled from the first to the second quarter of fiscal 1997 totaled $6.5 million. SH SAC ¶ 98.

Livent also manipulated its financial statements by transferring costs from a currently running show to one that had

either not yet opened or that had a longer amortization period. SH SAC ¶ 99. This accounting manipulation increased profits in one quarter by reducing the amortization of preproduction costs, an expense item. SH SAC ¶ 99. Under GAAP and Livent's own accounting policy, amortization of preproduction costs is only appropriate once a production has begun. SH SAC ¶ 99. In 1996 and 1997, approximately $12 million relating to seven different shows performed at 27 different locations were transferred to the accounts of 31 different future locations and ten other shows then in progress. SH SAC ¶ 99.

According to the Shareholders' theory, any auditor or Audit Committee member who reviewed Livent's production schedule, or even read the trade publications or *Variety* magazine, would have noticed clear red flags of this accounting manipulation. The Shareholders maintain that: D & T and the Audit Committee surely were aware of Livent's announced policy that costs of cancelled shows would be expended at the time of cancellation; the fact that particular shows had ended their runs was well known; and absence of any writedown at the time of the show's end necessarily meant that Livent was not following its own stated accounting policy, let alone complying with GAAP. SH SAC ¶ 100.

As had been done with the "Expense Rolls," Livent maintained a separate sets of books called the "Amortization Roll," to internally track the amount of amortization moved from current to future periods. SH SAC ¶ 101.

The cumulative impact of these accounting irregularities caused Livent to understate expenses by $3.5 million in fiscal year 1995, $18 million in fiscal year 1996, and $8.5 million in fiscal year 1997, and to overstate expenses by $2.7 million in the first quarter of fiscal year 1998. SH SAC ¶ 102.

The Shareholders assert that each of the manipulations described above was carried out by Livent's senior management and accounting department personnel. SH SAC ¶ 104. On a quarterly basis, Diane Winkfein ("Winkfein") and D. Grant Malcolm ("Malcolm")—Livent senior controllers—produced a general ledger showing quarterly financial results to Eckstein and Christopher Craib ("Craib"), another senior controller who had joined Livent from D & T in June 1997. Craib then placed this information into summary format for Drabinsky, Gottlieb, Eckstein, and Topol. SH SAC ¶ 105. This group, along with Messina, then met to review the results. SH SAC ¶ 105.

During these meetings, Drabinsky, Gottlieb, Eckstein, Topol, and Messina agreed on the quantity of top-line adjustments to be made to Livent's books to achieve the results they desired. SH SAC ¶ 102. Generally, Drabinsky directed that certain adjustments be made. SH SAC ¶ 106. Eckstein noted the desired adjustments, and communicated the adjustments to Winkfein and Malcolm, instructing them to make the adjustments in such a way as to give the appearance that they were original entries. SH SAC ¶ 106. Beginning in 1996, Malcolm communicated the transfers to fixed asset accounts to Tony Fiorino ("Fiorino"), Livent's theater controller, who recorded the adjustments in dummy theater cost accounts. SH SAC ¶ 106.

Once the top-line adjustments were made, Winkfein or Malcolm provided Eckstein with an adjusted general ledger containing the accounting manipulations. SH SAC ¶ 107. Drabinsky, Gottlieb, Topol, and Eckstein then met to review the manipulated results. SH SAC ¶ 107. Drabinsky directed that further adjustments be made, which Winkfein or Malcolm pro-

cessed in Livent's accounting system, under Eckstein's direction. SH SAC ¶ 107. After a final review by senior management, the manipulated numbers were presented to Livent's Audit Committee, D & T and investors, and were eventually incorporated into Livent's public filings with the SEC. SH SAC ¶ 107.

Due to the sheer magnitude of the manipulations, it was necessary to track results both before and after the top-line adjustments were made. SH SAC ¶ 108. At Eckstein's direction, Malcolm maintained computer files of the adjustments that tracked details of expense capitalization, expense rolls, and show-to-show cost transfers from 1995 to the first quarter of 1998. SH SAC ¶ 108. Fiorino also separately tracked the expenses that had been improperly transferred to theater construction accounts by creating a range of accounts in the general ledger and thereby measuring the true costs of Livent's theater construction program. SH SAC ¶ 108.

To make the adjustments, Malcolm identified individual invoices to alter. SH SAC ¶ 111. Then, on an invoice-by-invoice basis, he and Winkfein changed the distribution dates or account codes of these invoices, deleting the original entries from Livent's general ledgers and reposting fraudulent information. SH SAC ¶ 111. This process had the effect of making the adjusted entries appear as original transaction figures. SH SAC ¶ 111.

Beginning in mid–1997, Eckstein directed Craib to prepare quarterly schedules containing a comparison of actual and budgeted results. SH SAC ¶ 109. These schedules, which contained the "Expense Roll" and the "Amortization Roll," quantified certain of the accounting manipulations. SH SAC ¶ 109. Drabinsky, Gottlieb, Topol, Eckstein, and Messina met to review these schedules. SH SAC ¶ 109.

Beginning by at least October 1997, Messina prepared pre- and post-adjustment charts reflecting transferred amounts in detail, which she distributed to Drabinsky, Gottlieb, Topol, and Eckstein. SH SAC ¶ 109. After these meetings, Winkfein, Malcolm and Fiorino made adjustments to various accounts in the balance sheet and income statement, including expense categories, specific shows and fixed asset accounts. SH SAC ¶ 110.

The amount and magnitude of the adjustments eventually grew so great that it was not possible to make individual changes to Livent's general ledger. SH SAC ¶ 112. Eckstein directed Malcolm to instruct Livent's information services department to write a computer program that would allow the accounting staff to override Livent's accounting system. SH SAC ¶ 112. Livent's information services manager wrote computer programs to enable the accounting staff to execute adjustments on a batch basis. SH SAC ¶ 112.

With respect to the transferral of expenses from one show to another, Livent's policy was to expense costs of canceled shows at the time of cancellation, and it was well known when a particular show had ended its run. SH SAC ¶ 100. That no writedown was taken at the end of a show's run meant, the Shareholders contend, that Livent was not following its own accounting policy, and that D & T either knew it or was reckless in failing to recognize it. SH SAC ¶ 100. With respect to all of the accounting manipulations, the magnitude of the top-end adjustments was so great, and the existence of red flags so clear, that the misconduct should have been detected through independent confirmation procedures carried out in an audit conducted in accordance with Generally Accepted Auditing Standards ("GAAS"). SH SAC ¶ 114. Yet, D & T failed to examine evidence necessary to opine as to

the appropriateness of Livent's accounting treatment of these transactions. SH SAC ¶ 114.

The cumulative impact of these accounting irregularities caused Livent to materially understate expenses by approximately $3.5 million in fiscal 1995, $18 million in fiscal 1996, and $8.5 million in fiscal 1997, and to overstate expenses in the first quarter of 1998 by $2.7 million. SH SAC ¶ 102.

## C. OTHER FRAUDULENT CONDUCT

### 1. The Undisclosed Kickbacks

Beginning in 1990 and continuing through 1994, Drabinsky and Gottlieb allegedly operated a kickback scheme with two Livent vendors. SH SAC ¶ 128. Drabinsky and Gottlieb directed Eckstein to improperly capitalize the payments to the vendors, approximately $4 million, into preproduction costs. SH SAC ¶ 129. As a result, Livent's fiscal 1994, 1995 and 1996 financial statements, which reported preproduction costs of $28 million, $55.4 million and $75.6 million, respectively, were overstated by approximately $4 million in each year. SH SAC ¶ 129.

### 2. Materially False and Misleading Statements to Analysts

Commencing by at least the second quarter of 1995, Drabinsky, Gottlieb, and Topol regularly provided false financial information to Wall Street analysts, including projections of future performance predicated on false data. SH SAC ¶ 130. Livent also engaged in quarterly conference calls with analysts and other interested parties, in which Drabinsky, Gottlieb, and Topol were the main speakers and made materially false and misleading representations concerning Livent's financial results. SH SAC ¶ 130. On the basis of these representations, and Livent's reported financial results, the investment firm of Furman Selz issued buy recommendations for Livent stock in 1997 and 1998, and Cowen & Co. issued strong buy recommendations in 1996, 1997 and 1998. SH SAC ¶ 130. Also based on Livent's reported financials, PaineWebber Inc. issued buy recommendations in 1996, 1997 and 1998. SH SAC ¶ 130.

### 3. Fraudulent Ticket Purchases

From September through December 1997, Livent senior management arranged for Peter Kofman ("Kofman") and Roy Wayment ("Wayment") (the two vendors involved in the kickback scheme) to purchase tickets for Livent's Los Angeles production of "Ragtime" in order to inflate ticket sales reported to *Variety* magazine. SH SAC ¶ 131. This fraud was significant because if weekly ticket sales fell below $500,000, Livent's Los Angeles landlord, the Schubert Theater, could evict Livent pursuant to a clause in their lease contract. SH SAC ¶ 131. Since Livent planned to open "Ragtime" on Broadway in January 1998, poor sales in Los Angeles would have undermined its planned opening, and an eviction would have been devastating. SH SAC ¶ 131. Since management was counting on "Ragtime" to turn the financial fortunes of Livent around, it was imperative to portray the Los Angeles production of "Ragtime" as financially successful. SH SAC ¶ 131.

From September 30, 1997 to December 31, 1997, Kofman purchased tickets totaling U.S. $381,015 from the box office at the Schubert Theater in Los Angeles. SH SAC ¶ 132. Kofman made these purchases using his personal credit card or through personal checks or checks issued from one of his companies. SH SAC ¶ 132. Livent then reimbursed Kofman or his companies. SH SAC ¶ 132. In November 1997, Eckstein also enlisted Wayment to purchase tickets to the Los Angeles production of "Ragtime". SH SAC

¶ 132. Eckstein instructed Wayment to write checks to the Schubert Theater for tickets. SH SAC ¶ 132. Livent then reimbursed Wayment's construction company, Execway. SH SAC ¶ 132.

Eckstein directed the Livent accounting staff to improperly capitalize these ticket purchases in Livent's fixed asset accounts. SH SAC ¶ 133. As a result, Livent's fixed asset accounts were false and misleading. SH SAC ¶ 133. Moreover, the box office numbers reported by Livent to *Variety* magazine were materially false and misleading, designed to convey the false impression that "Ragtime" was a successful engagement in Los Angeles. SH SAC ¶ 133.

## D. *ALLEGATIONS OF MISCONDUCT SPECIFIC TO D & T*

In connection with the foregoing transactions, the Shareholders allege numerous failures and omissions on the part of D & T. They complain that in the year-end 1996 audit, D & T "acquiesced in Livent's improper revenue recognition for the Pace/'Show Boat' and Dewlim contracts, accepted an unprincipled compromise with respect to the Pace/'Ragtime' contract, and on the cost side, permitted continued capitalization of costs of a canceled loan." SH SAC ¶¶ 50–55, 57–65, 220. In the second quarter of 1997, D & T allegedly "approved of publication of a materially false press release, which it had reviewed, purporting to describe why Livent was revising its most recent quarterly results." SH SAC ¶¶ 66–73, 220. In the third quarter of 1997, D & T allegedly acquiesced in the improper recognition of revenue with respect to the AT & T Pantages Place naming rights transactions. SH SAC ¶¶ 81–85, 200.

In the year-end 1997 audit, D & T discovered it had been lied to with respect to the Put Agreement connected to the Dundee/Pantages air rights transaction, but nonetheless permitted immediate revenue recognition on that contract. SH SAC ¶¶ 77–84, 220. It also accepted improper revenue recognition with respect to the Pace/"Ragtime", American Artists, CIBC Wood Gundy, and AMEX exclusivity transactions. SH SAC ¶¶ 86–94, 220. Additionally, the Shareholders claim that D & T found approximately $500,000 worth of fraudulent accounting entries for advertising costs—twenty five percent of the total—but did nothing except reclassify the entries into the proper fiscal year and never expanded its sampling. SH SAC ¶¶ 115–117, 119, 122, 220. D & T was aware that no backup documentation had been provided despite numerous requests for several fixed asset account journal entries. SH SAC ¶ 118, 220. D & T permitted Livent to continue capitalizing loan origination costs after the loan was cancelled. SH SAC ¶¶ 123–126, 220. And finally, D & T dropped its request that Messina, Livent's Chief Financial Officer, and Jerald Banks ("Banks"), the General Counsel, sign representation letters attesting to the accuracy of Livent's accounting practices without inquiring as to why neither Messina nor Banks was willing to sign those standard representation letters. SH SAC ¶ 127, 220.

## E. *ALLEGATIONS OF MISCONDUCT SPECIFIC TO CIBC*

The Shareholders allege that between 1993 and 1998, CIBC had been Livent's primary lending institution. SH SAC ¶ 251. By late 1997, CIBC's financial services to Livent included a line of credit for $50 million, and a $125 million (U.S.) note offering arranged by CIBC Wood Gundy. To protect its interests, vis-a-vis the credit line, CIBC negotiated a secured interest in all of Livent's property. SH SAC ¶ 253.

According to the Shareholders, the amount of cash which Livent borrowed from CIBC increased precipitously from 1995 onward. In 1998, in particular, as Livent's financial condition rapidly deteriorated, its borrowings from CIBC approached the $50 million credit limit. SH SAC ¶ 254. As a result, according to the Shareholders, in June 1998 Livent issued roughly 4.5 million shares at $8 per share for aggregate net proceeds of $47.2 million. These proceeds were used to repay CIBC. SH SAC ¶ 254.

Livent was still losing a substantial amount of money by the end of the first quarter of 1998, so Drabinsky approached Lynx Ventures ("Lynx"), an entity controlled by Michael Ovitz, about an equity investment in Livent. SH SAC ¶ 265. According to the Shareholders, Drabinsky or Gottlieb promised CIBC that Gottlieb would sign an undertaking on behalf of Livent to issue stock "to Michael Ovitz (or an entity controlled by him) for net proceeds of not less than U.S. $20,000,000 . . . and promptly on receipt thereof to pay such net proceeds to CIBC . . . ." SH SAC ¶ 266. Before Livent, and thus CIBC, could receive Lynx's $20 million investment, however, Livent had to obtain a certification from D & T that Livent's financial statements for 1997 were prepared in accordance with GAAP. SH SAC ¶ 267. Gottlieb requested that CIBC "confirm" the terms of their royalty agreement in a letter that could be provided to D & T. SH SAC ¶ 267. Additionally, CIBC Wood Gundy was retained by Livent to opine on the fairness of the transaction. By letter dated April 24, 1998 and distributed to Livent's shareholders in the United States and elsewhere, CIBC Wood Gundy Securities provided its opinion (the "Fairness Opinion") that the proposed Lynx investment was fair, from a financial point of view, to Livent and its shareholders. SH SAC ¶ 271. The Fairness Opinion was attached to Livent's Form 6–K annual proxy circular (the "Circular") filed with the SEC on or about May 18, 1998, and attached to Livent's Form 40–F filed with the SEC on or about June 30, 1998. CIBC Wood Gundy also explicitly consented to having the Fairness Opinion attached to the Circular and publicly filed with all Canadian regulatory authorities. SH SAC ¶ 271.

According to the Shareholders, the Fairness Opinion misstated and failed to disclose material information. SH SAC ¶ 271. For example, according to the Shareholders, CIBC Wood Gundy stated in rendering its opinion that it had relied on Livent's audited financial statements, including those for the fiscal year ended December 31, 1997. However, it failed to disclose that: those financial statements were materially false and misleading as evidenced by the secret side agreement entered into between Livent and CIBC Wood Gundy; the financial statements had not been prepared in accordance with GAAP; the revenue and earnings per share amounts were materially overstated; and, Livent had falsified records. SH SAC ¶¶ 271–76.

The Shareholders contend that CIBC Wood Gundy also failed to disclose that it and CIBC had extracted from Livent the promise to pay over the $20 million in proceeds from the Lynx transaction promptly to CIBC in order to pay down Livent's credit balance with CIBC, thus failing to disclose that it and CIBC were interested parties in the Lynx transaction. SH SAC ¶¶ 271–76.

### F. LIVENT'S BANKRUPTCY

On November 18, 1998, Livent released its restated financial statements for 1996, 1997 and the first quarter of 1998, disclosed that investigations had revealed

" 'massive, systematic, accounting irregularities that permeated the Company' " and further announced, as a result, that D & T had withdrawn its audit opinions of the 1995, 1996, and 1997 financial statements and had issued new audit opinions on the restated 1996 and 1997 financial results. SH SAC ¶ 150. On the same day, Livent terminated Drabinsky and Gottlieb and sued them for fraud and breach of fiduciary duty. SH SAC ¶ 152.

Trading in Livent common stock resumed following Livent's restatement, and the price dropped from $6.75 to approximately $0.28 per share. *See Livent Shareholders I,* 78 F.Supp.2d at 202. On January 6, 1999, NASDAQ delisted Livent. *Id.*

### III. THE SECURITIES LAWS

The Shareholders contend that the acts and omissions of the various defendants involved in the Livent transactions described above, and in Livent's resulting downfall, violated §§ 10(b) and 20(a) of the Exchange Act. Specifically they argue that, given the magnitude and duration of the Livent Inside Directors' frauds, the supporting roles the Outside Directors, auditors and underwriters played in causing or not discovering the misconduct sooner, rendered them sufficiently culpable to fall within the scope of the statute. Thus, the Shareholders assert that the various defendants' involvement may be held to evidence fraudulent intent or recklessness for the purposes of recovery under § 10(b) and 20(a).

Defendants counter that the SH SAC does not plead facts with the particularity required to support a strong inference of fraud, and are therefore insufficient under Fed.R.Civ.P. 9(b) and the heightened pleading standards imposed by the PSLRA. In any event, according to defendants, the Shareholders' claims are insufficient to make out the elements required for liability under the § 10(b) theories of recovery the Shareholders assert.

Resolution of these disputes requires a review of the statutory framework embodied in the Exchange Act, and the effects of the PSLRA.

### A. *SECTION 10(b) AND SEC RULE 10b–5*

Section 10(b) of the Exchange Act provides in pertinent part that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b–5 "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 534 (2d Cir.1999). Under Rule 10b–5,

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any

act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. 240.10b–5 (1999).

■ To state a claim for relief under § 10(b) and Rule 10b–5, plaintiffs must allege that each defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir.1998).

The Exchange Act enlarged the scope of liability for violations of the securities laws in some ways. It encompassed the wrongful acts not only of issuers and sellers and their principals but a wider range of actors: not just the corporation's officers, managers and directors, as well as the underwriters, but the accountants and other professional service providers who typically play substantial roles in the preparation of documents upon which securities transactions and their ongoing value depend.

At the same time, in defining liability under § 10(b), Congress made the standard narrower and stricter. Its measure of culpability, while not expressly stated in the form of conduct Rule 10b–5 proscribes, has been limited to behavior demonstrating scienter. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In *Hochfelder*, the Supreme Court, holding that a private cause of action under § 10(b) and Rule 10b–5 cannot be maintained without any allegation of scienter, defined the term as "a mental state embracing intent to deceive, manipulate or defraud". *Id.* at 194, n. 12, 96 S.Ct. 1375. This requirement derives from analogy of Rule 10b–5 deception to the common law action for fraud, the elements of which mandate a showing of scienter. *See id.* at 197, 96 S.Ct. 1375; *see generally* W. Page Keeton, *et al.*, *Prosser and Keeton on Torts* § 107 (5th ed.1984) (herein *"Prosser"*).

In enunciating the scienter standard, the *Hochfelder* Court did not address some questions regarding how far the continuum of § 10(b) culpability extended. Among the issues left unresolved were some which have arisen in the case now before this Court: the applicability of Rule 10b–5 to actions brought against alleged aiders and abettors of securities violations and whether the scienter requirement can be satisfied by a showing of conduct which does not demonstrate actual knowledge or intent but which is alleged to be reckless. The aider and abettor question was settled by the Supreme Court in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), where the Court ruled that no such right of action exists under § 10(b).

The issue of recklessness as a measure of scienter, absent a clear mandate from the Supreme Court, has remained guided by doctrine developed by Circuit Court case law. Similarly extending common law principles governing the action for deceit, the lower courts generally have imposed on Rule 10b–5 actions a requirement that plaintiffs plead facts tending to demonstrate that defendants' conduct entailed reckless disregard for the truth or the utterance of a statement or omission known to be untrue. *See generally* 2 Thomas Lee Hazen, *The Law of Securities Regulation* § 13.4 at 498 (3rd ed.1995) (herein *"Hazen"*) (citing cases).

The Second Circuit Court of Appeals, even prior to *Hochfelder*, had advanced the proposition that a scienter standard which mirrored the common law formulation was

a prerequisite for liability in Rule 10b–5 actions. *See Lanza v. Drexel & Co.,* 479 F.2d 1277, 1301 (2d Cir.1973) *(en banc)* ("Other cases in this circuit clearly indicate that facts amounting to scienter, intent to defraud, reckless disregard for the truth, or knowing use of advice, scheme or artifice to defraud are essential to the imposition of liability") (quoting *Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 445 (2d Cir.1971)). The Circuit Court, in later specifically holding that reckless conduct could suffice to satisfy the scienter requirement under § 10(b) and Rule 10b–5, defined the term as:

> at the least, conduct which is "highly unreasonable" and which represents an extreme departure from the standards of ordinary cases ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.[3]

*Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.1978)(quoting *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977)) (ellipsis in original); *see also Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir.1996) (noting that in some cases "[a]n egregious refusal to see the obvious, or to investigate the doubtful" may give rise to an inference of recklessness)(quoting *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989)).

■ The concept of recklessness necessarily introduces imprecision and matters of degree into measures of culpability in actions brought under Rule 10b–5. *See Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000) ("Recklessness is harder to iden-

tify with such precision and consistency.") Recognizing that the term eludes more precise articulation and defies categorical tests, courts which have struggled with its formulation and application have essayed only that a finding of recklessness demands conduct that exceeds negligence but does not cross the threshold of intentional misconduct. *See Sanders* 554 F.2d at 793 ("We believe 'reckless' in these circumstances comes closer to being a lesser form of intent than merely a greater degree of ordinary negligence. We perceive it to be not just a difference in degree, but also in kind."). What the term encompasses has been variously portrayed as an approximation that borders on actual intent, or, as characterized by the Seventh Circuit, as "the functional equivalent of intent." *Sundstrand,* 553 F.2d at 1045; *see also Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 120–21 (2d Cir.1982) (Reckless conduct "must, in fact, approximate an actual intent to aid in the fraud being perpetrated..."); *In re Comshare Inc. Sec. Litig.,* 183 F.3d 542, 550 (6th Cir. 1999) (describing recklessness as being "apart from negligence and akin to conscious disregard"). Accordingly, as the *Sundstrand* standard explicitly mandates, simple or even inexcusable negligence will not suffice to satisfy the § 10(b) scienter requirement. *See Sundstrand,* 553 F.2d at 1044–45; *National Union Fire Ins. Co. v. Wilkins–Lowe & Co.,* 29 F.3d 337 (7th Cir.1994); *see also Hazen* § 13.4 at 499 ("It is clear that in order to establish scienter, the defendant must have had more than a tangential connection to both

---

**3.** This definition parallels the test promulgated by the Seventh Circuit in *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977), *cert denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977), and later followed by several other Circuit Courts: "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

the transactions and the statements under scrutiny.")

Further elaboration on what conduct may suffice to state a securities claim alleging recklessness was recently supplied by the Second Circuit in *Novak.* The Court of Appeals there surveyed the Circuit's prior decisions articulating the circumstances it had upheld as sufficient to plead scienter in securities fraud cases. *See Novak,* 216 F.3d at 307–08 (citing cases). Specifically, the court identified standards requiring allegations of facts demonstrating that defendants: (1) benefitted in some concrete and personal way from the fraudulent conduct plaintiffs asserted, or (2) engaged in intentional misconduct (easily defined as deliberate illegal behavior) or recklessness. *See id.*

Turning to recklessness, the Court of Appeals acknowledged that the various general standards propounded by the courts "offer little insight into precisely what actions and behaviors constitute recklessness sufficient for § 10(b) liability." *Novak,* 216 F.3d at 308. For concrete guidance the Circuit Court instead referred in the first instance and by way of example to the "actual facts" of the Circuit's securities fraud cases decided prior to the enactment of the 1995 Reform Act. The court specifically highlighted cases entailing allegations of facts demonstrating that defendants:(1)possessed knowledge of facts or access to information contradicting their public statements, (citing *Cosmas v. Hassett,* 886 F.2d 8, 12 (2d Cir.1989)); *Goldman v. Belden,* 754 F.2d 1059, 1063 (2d Cir.1985); or (2) "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak,* 216 F.3d at 308 (citing *Rolf,* 570 F.2d at 47–48); *SEC v. McNulty,* 137 F.3d 732, 741 (2d Cir.1998).

The Second Circuit cautioned, however, that its jurisprudence concerning securities fraud based on reckless conduct encompasses certain important limitations on the scope of liability. First, the court has refused to allow plaintiffs to proceed with allegations of "fraud by hindsight." *Novak,* 216 F.3d at 309 (citing *Stevelman v. Alias Research Inc.,* 174 F.3d 79,85 (2d Cir.1999); *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995) (allegations that defendants should have anticipated future events and made earlier disclosures did not suffice to make out a claim of fraud)).

Second, the court noted cases holding that corporate managers are not obligated to portray their business' performance and prospects in unduly cautious or gloomy terms in public pronouncements, so long as their representations are consistent with reasonably available data. *See Novak,* 216 F.3d at 309 (citing *Stevelman,* 174 F.3d at 85; *Shields v. Citytrust Bancorp, Inc.* 25 F.3d 1124, 1129–30 (2d Cir.1994)).

Third, the court recognized that it had established limits on the scope of liability for failure to monitor alleged fraudulent conduct of third persons. *See Novak,* 216 F.3d at 309. Relevant to the facts in the case now before this Court, the Second Circuit specifically observed that "the failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability." *Id.* (citing *Decker,* 681 F.2d at 120); *Chill,* 101 F.3d at 269–70 (the failure of a parent company to regard the extraordinary profitability of its subsidiary's particular form of trading as signaling problems compelling further investigation does not constitute adequate grounds for a finding of recklessness sufficient for liability under § 10(b)).

Finally, and also particularly pertinent to the case at hand, the Court of Appeals referred to its prior rulings that allegations of GAAP violations or accounting irregularities, standing alone, do not suffice to state a securities fraud claim. *See Novak*, 216 F.3d at 309 (citing *Stevelman*, 174 F.3d at 84; *Chill*, 101 F.3d at 270). In this connection, such allegations may be sufficient only when coupled with evidence of "corresponding fraudulent intent". *See Novak*, 216 F.3d at 309 (quoting *Chill*, 101 F.3d at 270).

This analytic framework reflects the Supreme Court's interpretation of Congressional intent embodied in § 10(b). In several rulings demarcating the bounds of the conduct to which the statutory scheme of § 10(b) extends, the Supreme Court could not be more emphatic in stressing that Congress manifested a purpose to draw the line at knowing, intentional or extreme behavior, and to distinguish fraudulent actions from lesser wrongs. In *Hochfelder*, the Supreme Court stressed that in choosing the words "manipulative or deceptive device or contrivance", Congress did not intend the prohibition of § 10(b) to encompass alleged violations that constitute mere negligence. *See Hochfelder*, 425 U.S. at 197, 96 S.Ct. 1375. Based on similar reasoning, the Supreme Court held in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), that § 10(b) did not reach breaches of fiduciary duties by majority shareholders where there was no showing of conduct involving manipulation or deception. The principle was reinforced in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), where the Supreme Court determined that § 10(b) is not violated when a trader transacts in securities without disclosing inside information which he had no independent duty to disclose. Most recently, in *Central Bank of Denver*, 511 U.S. at 177, 114 S.Ct. 1439, the Court,

overturning 25 years of circuit court precedents to the contrary, ruled that the 1934 Act does not establish a cause of action of aiding and abetting a § 10(b) securities violation.

■ Articulating its reading of the will of Congress, the Supreme Court reaffirms and underscores in these cases that § 10(b) was designed to capture the higher grade of wrongful conduct associated with conscious or egregious actions, incorporating within the contours of the statute a standard of culpability that reflects not just matters of shades or degrees, but of fundamental substance. As the Supreme Court noted, "not every instance of financial unfairness constitutes fraudulent activity under § 10(b)." *Chiarella*, 445 U.S. at 232, 100 S.Ct. 1108. Thus, while § 10(b) has been described and may have been contemplated as a "catchall" provision, "what it catches must be fraud". *Id.* at 234–35, 100 S.Ct. 1108.

## B. *SECTION 20(a)*

Section 20(a) of the 1934 Act states that

[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

■ Courts within the Second Circuit have been divided on whether a complaint must contain pleadings of scienter or culpable participation for a plaintiff to state a claim for § 20(a) liability. In *Marbury Management, Inc. v. Kohn*, 629 F.2d 705,

716 (2d Cir.1980), the Second Circuit, ruling that respondeat superior theory of liability is not precluded by § 20(a), remarked that

> [w]hile the precise standard of supervision required of broker-dealers to make good the good faith defense of section 20(a) is uncertain, where, as in the present case, the erring salesman completes the transactions through the employing brokerage house and the brokerage house receives a commission on the transactions, the burden of proving good faith is shifted to the brokerage house, and requires it to show at least that it has not been negligent in supervision, and that it has maintained and enforced a reasonable and proper system of supervision and internal control over sales personnel.

Many district courts have focused on this language in holding that neither scienter nor culpable participation are required to make out a *prima facie* case of control person liability—rather, all that is required is an allegation of control status. *See, e.g., Borden v. Spoor Behrins Campbell & Young, Inc.*, 735 F.Supp. 587, 588 (S.D.N.Y.1990) (ruling that question has been "resolved authoritatively"); *In re Citisource, Inc. Sec. Litig.*, 694 F.Supp. 1069, 1076 (S.D.N.Y.1988) (stating that "it has long been held that once a defendant has been shown to be a controlling person, the burden shifts to that defendant to establish his good faith"); *Polycast Technology Corp. v. Uniroyal*, No. 87 Civ. 3297, Fed. Sec. L. Rep. (CCH) ¶ 94,005, 1988 WL 96586, *7 (S.D.N.Y. Aug. 31, 1988) (same);

*Terra Resources I v. Burgin*, 664 F.Supp. 82, 88 (S.D.N.Y.1987) (same); *Savino v. E.F. Hutton & Co.*, 507 F.Supp. 1225, 1243 (S.D.N.Y.1981) (same).

A separate line of cases, relying on the Second Circuit's decisions in *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir.1973) and *Gordon v. Burr*, 506 F.2d 1080 (2d Cir.1974), requires the pleading of something more than control status to sustain a § 20(a) claim. The Circuit Court in *Lanza* remarked that "[t]he intent of Congress in adding [§ 20(a) ] ... was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Id.* at 1299. Citing this language, many district courts have thus reasoned that the plaintiff must plead culpability as part of the *prima facie* case. *See, e.g., Morse v. Weingarten*, 777 F.Supp. 312, 318 (S.D.N.Y.1991) (requiring plaintiff to plead defendant's knowledge of primary violation); *In re Par Pharmaceutical, Inc. Sec. Litig.*, 733 F.Supp. 668, 679 (S.D.N.Y.1990) (plaintiffs must allege that defendants were "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons"); *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962, 979 (E.D.N.Y.1988) (requiring plaintiff to plead defendant's knowledge), *vacated in part on other grounds sub nom. In re Crazy Eddie Sec. Litig.*, 714 F.Supp. 1285 (E.D.N.Y.1989); *Harrison v. Enventure Capital Group, Inc.*, 666 F.Supp. 473, 478 (W.D.N.Y.1987) (culpable participation must be alleged).[4]

---

4. The split described above is reflected among Circuits, and even within other circuits the district courts evince similar disarray and inconsistent rulings with regard to the § 20(a) pleading standard. Unfortunately, the holdings of other Circuits with respect to pleading requirements under § 20(a) do not provide additional edification which would aid this

Court in the present proceedings. *Compare Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir.1996) (rejecting the culpable participant requirement); *Metge v. Baehler*, 762 F.2d 621 (8th Cir.1985) (same); *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir.1998) (same); *Brown v. Enstar Group*, 84 F.3d 393, 397, n. 5 (11th Cir.1996)

More recently, the Second Circuit articulated the applicable standard relevant to § 20(a) liability. However, without acknowledging or otherwise addressing the rift among the district courts, the Court of Appeals in fact added fuel to the debate. In *S.E.C. v. First Jersey*, 101 F.3d 1450, 1472 (2d Cir.1996), the court, citing *Lanza*, stated that "in order to establish a *prima facie* case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, ... and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." Relying on *First Jersey*, some courts, without elaboration, have required the plaintiff to plead culpable participation as an element of a § 20(a) claim—the position adopted by Judge Sweet in dismissing the § 20(a) claim in the related Livent Shareholders' Action. *See Shareholders I*, 78 F.Supp.2d at 221. Indeed, the courts may have concluded that the circuit definitively resolved the intra-circuit split in *First Jersey* by holding that a plaintiff must plead culpable participation.

But further inquiry may be indicated. As noted by Judge Preska in *Mishkin v. Ageloff*, No. 97 Civ. 2690, 1998 WL 651065, *7 (S.D.N.Y. Sep. 23, 1998), "although the [circuit] court does indeed refer to the elements of a *prima facie* case, *First Jersey* was not a pleading case—it was an appeal from a final judgment after a bench trial.... This distinction between procedural postures is critical." In addition, *First Jersey* does not address any of the

district court decisions that manifest the split. It seems unlikely that the circuit court would resolve this pleading issue in a case where the pleading standard was not directly before it, without announcing its intention to do so, and without mentioning a single district court case which discusses the division. *See id.*

Cause for additional scrutiny is suggested by an ambiguity that *First Jersey* raised and left unanswered. While stating that a showing of culpable participation is an element necessary to state a *prima facie* case, the court also adhered to and applied the *Marbury Management* standard, shifting the burden of proving good faith to the defendant and requiring it to show that it acted properly. *See First Jersey*, 101 F.3d at 1472–73.

The incongruity inherent in these conflicting standards has been noted by other courts. Judge Sweet has observed that "[d]espite the circuit court's apparent holding in *First Jersey* that both controlling person status and a person's culpable participation are part of the *prima facie* case, the court went on to state that 'there can be no question that [the defendant] was a controlling person.... Hence, in order to escape controlling-person liability, [he] had the burden [to establish good faith].' " *Dietrich v. Bauer*, 126 F.Supp.2d 759, 766 n. 4 (S.D.N.Y.2001) (quoting *First Jersey*, 101 F.3d at 1472–73). This shift in the burden of proof "seem[s] to elide the culpable participation element" of the *prima facie* case. *Id.* at 764. If "good faith and lack of participation are affirmative defenses, ... requiring them as part of the plaintiff's *prima facie* case ... confuses the

---

(same) *with Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir.1975) (requiring culpable participation); *Carpenter v. Harris, Upham & Co., Inc.*, 594 F.2d 388, 394 (4th Cir.1979) (same). The Ninth Circuit has recently overruled itself. *Compare Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1574–75

(9th Cir.1990) *with Zweig v. Hearst Corp.*, 521 F.2d 1129, 1132 (9th Cir.1975). Courts in the Fifth Circuit are divided. *Compare G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 958 (5th Cir.1981) *with Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990).

parties' responsibilities." *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 959 (5th Cir.1981); *accord Metge v. Baehler*, 577 F.Supp. 810, 816 (S.D.Iowa 1984) ("culpability and good faith are two sides of the same issue"), *aff'd in pertinent part*, 762 F.2d 621 (8th Cir.1985). In other words, requiring the plaintiff to plead culpability, at the same time requiring the defendant to prove good faith at trial, engenders an awkward allocation of pleading and proof whereby both parties bear burdens on the same issue.

Nevertheless, just as Judge Preska expressed in *Mishkin*, this Court cannot ignore the import of *First Jersey*, especially in light of the Second Circuit's subsequent affirmations of the same standard. Nothing precludes such a burden-shifting scheme, and however unusual it may be to require the plaintiff to plead an element that, at trial, the defendant bears the burden to disprove, reading *First Jersey* this way reconciles the apparent inconsistency.

The Second Circuit has recently restated *First Jersey*'s formulation of the rule, though again in contexts that leave some doubt as to its binding effect. In *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998), the court routinely laid out the *First Jersey* elements. *Id.* ("In order to establish a *prima facie* case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation.") (internal quotation marks omitted). What constitutes sufficient pleadings for a § 20(a) claim, however, was not before the court. In *Boguslavsky*, the Second Circuit simply decided that plaintiff's § 20(a) claim was not collaterally estopped.

Most recently, in *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir.

2000), the Circuit reversed the district court's dismissal of a § 10(b) claim at the pleading stage, and then, seemingly in passing, iterated the *First Jersey* rule and concomitantly reversed the dismissal of the derivative § 20(a) claim, which the district court had dismissed for failure to plead primary liability of the controlled person. The culpability of the controlling person and the pleading standard to state a claim under § 20(a) were not at issue in *Ganino*.

In *Mishkin*, Judge Preska ultimately determined that despite *First Jersey*'s laconic treatment of the issue, its statement of the rule cannot be overlooked. 1998 WL 651065 at *24. This conclusion is sound, particularly in light of the Circuit Court's recapitulations of the test in *Boguslavsky* and *Ganino*. This outcome also comports with the general intent of the 1995 Reform Act. As discussed below, Congress intended the PSLRA to make it "substantively harder for plaintiffs to bring securities fraud cases." *Greebel v. FTP Software*, 194 F.3d 185, 196 n. 9 (1st Cir.1999); *see also* discussion *infra* Part III.C.2. While this Court would wish clearer guidance, until the Court of Appeals addresses the issue more explicitly, it seems that the authority available balances toward holding that the plaintiff bears the burden of pleading culpability as part of a *prima facie* case under § 20(a). The Court now turns to the standard of culpability the plaintiff must plead.

In *Hochfelder*, the Supreme Court held that scienter is a necessary pleading element of § 10(b) actions. The Court reasoned in part that Congress's use of the words "manipulative or deceptive device or contrivance" in the language of § 10(b) "strongly suggest[s] that § 10(b) was intended to proscribe knowing or intentional misconduct." *Hochfelder*, 425 U.S. at 197, 96 S.Ct. 1375. Especially pertinent to the

discussion here is the Court's statement that "each of the provisions of the 1934 Act that expressly create civil liability, except those directed to specific classes of individuals ... contains a state-of-mind condition requiring something more than negligence." *Id.* at 209, n. 8, 96 S.Ct. 1375. The Supreme Court then explicitly cited § 20(a) as an example of these "state-of-mind" provisions. *Id.*

While *Hochfelder* makes clear that a § 20(a) plaintiff must allege facts suggesting that the defendant's conduct exceeded that of mere negligence, there is some disagreement within this Circuit about what standard beyond negligence is required. In *Mishkin*, the court determined that the culpability standards under § 20(a) and § 10(b) are symmetrical. *See* 1998 WL 651065 at *25. Judge Preska concluded that there was "no good reason to apply one strong inference standard to § 10(b) claims and another strong inference standard to § 20(a) claims. Thus, because the plaintiff was required to plead particularized facts of the defendant's conscious misbehavior under § 10(b), the same requirement existed for the § 20(a) claim.

Other courts in this district have not followed the exacting culpability standard employed in *Mishkin*. For instance, in *Gabriel Capital, L.P. v. NatWest Finance, Inc.*, 122 F.Supp.2d 407, 428 (S.D.N.Y. 2000), Judge Scheindlin did not quarrel with the symmetry standard proffered in *Mishkin*, but did note that *Mishkin* "applied only a portion of [the § 10(b) ] standard" because recklessness, and not just intent, is encompassed within § 10(b). *Id.* at 428. The *Gabriel Capital* court stated that "recklessness adds an important dimension to the § 10(b) analysis, because it allows a plaintiff to plead that the defendant knew or should have known that it was misrepresenting material facts." *Id.*

Therefore, by finding recklessness infused in the § 20(a) culpability standard, Judge Scheindlin ruled that the plaintiffs had satisfied their burden by pleading particularized facts that the alleged controlling defendant "knew or should have known that [the primary violator] was engaging in fraudulent conduct..." *Id.* at 429.

Without specifically stating that § 20(a) plaintiffs may plead recklessness, as opposed to conscious misbehavior or actual fraudulent intent, to satisfy their burden of showing culpability, rulings of other courts in this Circuit support the proposition. In *In re Twinlab Corp. Sec. Litig.*, 103 F.Supp.2d 193, 208 (E.D.N.Y.2000), the court dismissed the plaintiffs' § 20(a) claim despite the complaint's allegations that the defendants had access to financial statements and the capacity to prevent their fraudulent issuance. To survive the motion to dismiss, the plaintiffs further needed to allege "facts demonstrating that [the defendants] culpably participated in the scheme, rather than, for example, unknowingly approving credible but fraudulent financial reports prepared by subordinates." *Id.* Similarly, in *Ruskin v. TIG Holdings, Inc.*, 98 CIV. 1068, 2000 WL 1154278, at *7, (S.D.N.Y. Aug. 14, 2000), the court held that the plaintiffs' complaint was sufficient because it alleged facts showing that the defendant "knew or should have known" of the fraudulence of the information disseminated.

This Court is persuaded that recklessness is the appropriate minimum standard of culpability that plaintiffs must plead under § 20(a). This result reflects the purposes and spirit of the 1995 Reform Act. *See* discussion infra Part III.C.2.

## C. THE 1995 REFORM ACT

### 1. Pleading Standards

■ Congress enacted the PSLRA in response to concerns about perceived

abuses of private class actions in securities fraud litigation. In particular, Congress sought to deter strike suits of dubious merit filed for their vexation value, or as instruments intended to extract large settlements through unfounded assertions of fraud against any person associated with corporate bad news which causes the price of an issuer's stock to drop significantly. *See Novak,* 216 F.3d at 306.[5]

To these ends, the PSLRA enacted a number of amendments to the 1933 and 1934 Acts that come into play in the case at bar. Section 21D(b)(1) requires that in connection with any private action arising under the statute in which plaintiffs allege to have been misled by defendants' untrue statements or omissions of material fact

> the complaint shall specify each statement alleged to have been misleading, the reasons or reasons why statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1) (herein "Subsection (b)(1)"). Section 21D (b)(2) mandates that in actions under the statute

> in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2) (herein "Subsection (b)(2)"). Section 21D(b)(3)(A) mandates that the courts dismiss complaints which fail to satisfy the pleading standards promulgated in Subsections (b)(1) and (b)(2). *See* 15 U.S.C. § 78u–4(b)(3)(A) (herein "Subsection (b)(3)(A)"). And Section 21 D(b)(3)(B) directs the courts in § 10(b) actions to impose a stay on all discovery during the pendency of any motion to dismiss. *See* 15 U.S.C. § 78u–4(b)(3)(B) (herein "Subsection (b)(3)(B)").

Two important issues emerge from the adoption of the PSLRA critical to the resolution of motions before this Court: the statute's effect on the pleading standards of scienter and on the particularity required in the Shareholders' pleadings detailing the circumstances constituting securities fraud. As a threshold matter, and as courts which have previously examined the question have concluded, the PSLRA addresses the pleading requirements governing securities litigation, and not the existing substantive standards and understanding of "scienter" as defined in settled case law. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534 (3rd Cir.1999) (Subsection (b)(2) "was intended to modify procedural requirements while leaving substantive law undisturbed"); *In re Baesa Sec. Litig.,* 969 F.Supp. 238 (S.D.N.Y. 1997) (the PSLRA did not raise the scienter requirement to demand more than recklessness); *see also* Joint Explanatory

---

**5.** The PSLRA Conference Committee Report noted that Congress was prompted to enact reforms by evidence of abusive practices committed in private securities litigation, including: "(1) the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action;

(2) the targeting of deep pocket defendants, including accountants, underwriters, and individuals who may be covered by insurance, without regard to their actual culpability; (3) the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle; and (4) the manipulation by class action lawyers of the clients whom they purportedly represent." H.R. Conf. Rep. No. 104–369, at 31–32 (1995).

Statement of the Committee of Conference, S. Res. 1260, 104th Cong.2d Sess., Cong. Rec. H0774, H10775 (Daily Ed. Oct. 13, 1998) (in enacting the PSLRA Congress "did not intend to alter the standards of liability under the Exchange Act."); *Hazen* § 13.4 at 127 (2000 Pocket Part). *But see In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 974, 979 (9th Cir.1999) (Congress intended the PSLRA to elevate the pleading standard beyond simple recklessness, requiring plaintiffs to allege facts indicating "deliberate recklessness"—a degree of misconduct "that strongly suggests actual intent").

The PSLRA, however, has occasioned spirited debate and sharp divisions among the courts with regard to interpretation of its pleading prerequisites, in particular those required by Subsection (b)(2). *See Novak,* 216 F.3d at 309–10. On the surface, the split centers on the extent to which Congress intended the 1995 Reform Act to strengthen existing pleading requirements in securities litigation. One of the central points at issue in this aspect of the debate is the Second Circuit's pre-PSLRA standard.

The Second Circuit's securities fraud pleading test, applied to determinations of the sufficiency of the complaint in § 10(b) cases, required plaintiffs to allege facts "that give rise to a strong inference of fraudulent intent." *Acito,* 47 F.3d at 52. The "strong inference" requirement could be fulfilled by either of two ways: alleging facts that (a) show defendants had "both motive and opportunity to commit fraud", or (b) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (quoting *Shields,* 25 F.3d at 1128).

The point of disagreement among the courts turns on the "motive and opportunity" prong of the Second Circuit's test, a standard which, standing alone, has been viewed as less rigorous than that of intentional misconduct or recklessness. A number of courts have adopted the view that Congress intended the PSLRA to enhance pleading requirements in securities cases, and thus that allegations of motive and opportunity with nothing more would not create an inference of scienter sufficiently strong to satisfy the enhanced pleading stringency the PSLRA mandated to state a claim under § 10(b). *See Silicon Graphics,* 183 F.3d at 979 (adopting a pleading standard requiring facts demonstrating "deliberate or conscious recklessness"); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1282–86 (11th Cir.1999) (holding that the PSLRA particularity requirement compels plaintiffs to allege "severe recklessness"); *Comshare,* 183 F.3d at 550 (equating recklessness to being "akin to conscious disregard", concluded that plaintiffs may survive a motion to dismiss by pleading facts that give rise to a strong inference of recklessness); *Greebel v. FTP Software,* 194 F.3d 185, 195–96 (1st Cir. 1999) ("[I]nferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong inferences.' "); *In re Glenayre Technologies, Inc. Sec. Litig.,* 982 F.Supp. 294 (S.D.N.Y.1997); *Baesa,* 969 F.Supp. at 238.

A contrary view, citing legislative history and the use of the "strong inference" language derived from Second Circuit case law, holds that the PSLRA effectively imported the Second Circuit's test in its entirety, enabling plaintiffs to satisfy the inference of scienter with sufficient allegations of facts showing either motive and opportunity, or a strong demonstration of intentional misconduct or recklessness. *See Advanta,* 180 F.3d at 534 ("[u]se of the Second Circuit's language compels the conclusion that the Reform Act establishes a pleading standard approximately equal in stringency to that of the Second Cir-

cuit"); *Press,* 166 F.3d at 537–38 [6]; *Dietrich v. Bauer,* 76 F.Supp.2d 312 (S.D.N.Y. 1999); *Rubinstein v. Skyteller, Inc.,* 48 F.Supp.2d 315, 320 (S.D.N.Y.1999); *see also* S.Rep. No. 104–98, at 15 (1995) (indicating that the Conference Committee intended to reinforce the requirements for pleading scienter in securities litigation and adopted "a uniform standard modeled upon the pleading standard of the Second Circuit"). *But see Greebel,* 194 F.3d at 195–196 ("the words of the Act neither mandate nor prohibit the use of any particular method to establish an inference of scienter."); *Silicon Graphics,* 183 F.3d at 974 (concluding that "Congress intended to elevate the pleading requirement above the Second Circuit standard" of simple recklessness); *Sturm v. Marriott Marquis Corp.,* 26 F.Supp.2d 1358, 1368–69 (N.D.Ga.1998); *see also Hazen* § 13.4 at 504 (2000 Pocket Part) (while Congress adopted the Second Circuit's "strong inference" rule as the requisite measure of scienter, "there is some legislative history indicating a rejection of the rule that an inference could be established by allegations that there was both motive and opportunity to commit fraud") (citing cases, as well as H.R. Conf. Rep. No. 104–369, at 41, which indicates that the Senate rejected an amendment that specifically would have incorporated this component of the Second Circuit's standard).

In *Novak,* the Second Circuit addressed these ambiguities and the related disagreements. Reviewing the relevant PSLRA legislative history, the court found conflicting expressions of legislative intent. *See Novak,* 216 F.3d at 311. Accordingly, the Circuit. Court concluded that Congress plainly sought to impose a stricter uniform pleading standard and did so not by exceeding the Second Circuit's rule, but by effectively lifting the requirement nationwide "to that previously existing in this circuit and no higher (with the exception of the 'with particularity' requirement)." *Id.* at 310. However, that Congress had failed to include language about motive and opportunity suggested to the Circuit Court panel that "we need not be wedded to these concepts in articulating the prevailing standard." *Id.*

In the final analysis, the court held that the PSLRA codified the Second Circuit's "strong inference" rule for pleading scienter. Advising lower courts and litigants that in determining whether pleaded facts sufficiently gave rise to the inference of scienter, they "need and should not employ or rely on magic words such as 'motive and opportunity'." *Id.* at 311. The Court of Appeals pointed for guidance to the various cases and factors described above illustrating the types of particular circumstances the court had recognized as probative of the requisite strong inference. *See id.; see also Rothman v. Gregor,* 220 F.3d 81, 90–91 (2d Cir.2000) (citing *Novak* and applying both prongs of the Second Circuit's strong inference standard); *Ganino,* 228 F.3d at 168–70 (without referring to *Novak,* restates the Circuit's pre-PSLRA pleading standard, expressly rejecting the argument that the PSLRA eliminated the option to plead scienter based on the defendant's motive and opportunity to commit fraud).[7]

This Court notes that in practice the Circuit Court's instructions in *Novak* may

---

**6.** In citing *Press,* the *Novak* court parenthetically characterizes its reference to the *Press* discussion of the issue as "dicta". *See Novak,* 216 F.3d at 310.

**7.** Several of district courts in this district have continued to adhere to the Second Circuit's pre-PSLRA standard. *See e.g., Gabriel Capital,* 122 F.Supp.2d 407; *Apex Arc, Inc. v. Garvey,* 104 F.Supp.2d 326 (S.D.N.Y.2000); *In re Twinlab Corp.,* 103 F.Supp.2d 193.

be subject to different readings, as evidenced by the divergent arguments among the parties here about what the Second Circuit intended and how the factors *Novak* cites for guidance should be applied to the circumstances of the case at bar. The parties on both sides of the dispute now before this Court contend that *Novak* supports their respective positions for and against § 10(b) liability here. The crux of the disagreement relates to the *Novak* language indicating that the precedents the court refers to suggest that the requisite "strong inference" may arise where the complaint alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate", or that they "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311. Elaborating on the first of these criteria earlier in the opinion, the court noted that "[u]nder such circumstances, defendants knew or, *more importantly, should have known* that they were misrepresenting material facts related to the corporation." *Id.* at 308 (emphasis added).

Read narrowly and isolated from their context, these propositions may lend themselves to misinterpretation. Terms such as "failed to check information" or "should have known" occur familiarly in the parlance and jurisprudence of simple negligence and bespeak concepts that could be read to be more compatible with a finding of ordinary carelessness than to the more egregious forms of misconduct that comprise recklessness. *See, e.g., Greebel*, 194 F.3d at 199 (clarifying that the holding in an earlier case referring to the words "should have known" were understood to convey stricter "reckless disregard sense" [as opposed to mere negligence] that had been applied in prior First Circuit doctrine). To avoid unintended misconstruction, the Circuit Court's guidance must be placed in proper context. In this Court's

understanding, the factors *Novak* cites do not articulate a new, diminished requirement of scienter but only suggest illustrative tests encapsulating particular types of circumstances probative of scienter by which, in light of the PSLRA, the Circuit's actual standard may be applied. *See Rothman*, 220 F.3d at 85.

Both prefacing and framing the application of the *Novak* factors is the legal standard of scienter still in effect as it derives from *Hochfelder* and *Rolf.* These cases and their progeny continue to demand that in § 10(b) actions plaintiffs plead facts showing scienter, characterized as "intent to deceive, manipulate or defraud." *Hochfelder* 425 U.S. at 193, 96 S.Ct. 1375. The standard may still be satisfied by pleadings tending to demonstrate recklessness, defined by existing Second Circuit doctrine as requiring conduct that is "*at the least,* highly unreasonable" and represents "an *extreme departure* from the standards of ordinary care." *Rolf,* 570 F.2d at 47 (emphasis added) (citation omitted). Accordingly, the exemplary rules to which *Novak* directs district courts for guidance in determining whether plaintiffs' pleadings have satisfied the "strong inference" requirement presuppose that, under the facts and circumstances particular to the given case, the types and degrees of misbehavior alleged to fall within those highlighted by the *Novak* factors nonetheless constitute severe misconduct that rises to the level of what may be deemed egregious, or that may be found highly unreasonable and represents an extreme departure from acceptable norms of ordinary care.

This construction is supported by explanatory and qualifying language the *Novak* court is careful to add in clarifying its ruling. Thus, the court references several "important limitations" on the scope of liability for securities fraud based on reck-

less conduct. *See Novak*, 216 F.3d at 309. In each instance the specific examples the court offers—fraud by hindsight; negative public statements consistent with reasonably available data; failure to adequately monitor the behavior of others; and accounting violations standing alone— impose constraints that manifest application of the rule solely to forms of highly unreasonable or extreme misconduct, rather than simply to mere deviations from standards of ordinary care. *See id.* This distinction reaches the undercurrents of deeper issues implicated in the discourse and disaccord among the various courts' interpretations of the PSLRA. More fundamentally, it goes to the heart of Congress's intent in enacting the statute, as well as to the law's substantial implications.

### 2. *Policy and Procedural Objectives*

■ Before applying the PSLRA and *Novak*'s interpretive guidance to rulings on the motions now before it, this Court feels obliged to offer some additional contextual observations touching on these matters, and to suggest the larger framework upon which the Court perceives its determinations here must be grounded. An appropriate point of departure for these considerations is an avowal of the "inevitable tension" that the Second Circuit has acknowledged exists between two social ends. On the one hand, there is the interest of society in deterring and remedying securities fraud by recognizing that victims of fraud generally are unable to particularize their claims until they have gathered sufficient evidence. On the other lies society's countervailing interest in "deterring the use of the litigation process as a device for extracting undeserved settlements as the price of avoiding the extensive discovery costs that frequently ensue once a complaint survives dismissal. . . ." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d

259, 263 (2d Cir.1993), *cert. denied* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).

Under the prevailing pre-PSLRA notice pleading rules and practice compelled by *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), coupled with the doctrine that on a motion to dismiss for failure to state a claim, plaintiffs' factual allegations are to be deemed true and reasonable inferences to be drawn in their favor, the balance in § 10(b) litigation tended to be solicitous of the complaint. *See, e.g., Goldman*, 754 F.2d at 1070; *Cosmas*, 886 F.2d at 12. These pleading standards instruct that a complaint may not be dismissed unless, in *Conley*'s oft-quoted phrase, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45–46, 78 S.Ct. 99. Heeding this mandate, some prevailing case law inclined to the pleading leniency *Conley* demanded.

In securities fraud cases, despite the particularity required by Fed.R.Civ.P. 9(b) for averments constituting the circumstances of the fraud asserted and the scienter requirement *Hochfelder* propounded, some courts permitted generalized pleadings or relaxed specificity of the requisite fraudulent intent to survive motions to dismiss, relying for authority on the language of Rule 9(b) itself, which provides that "malice, intent, knowledge, and other condition of mind, may be averred generally". *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir.1994) (*en banc*) (holding that plaintiff may satisfy the state of mind pleading requirement "simply by saying that scienter existed."); *see also Cosmas*, 886 F.2d at 12 (noting that under Rule 9(b) a complaint need only aver intent generally, although it nonetheless must allege facts that give rise to a strong inference of

fraudulent intent); *Goldman,* 754 F.2d at 1070 ("Thus, great specificity was not required with respect to the allegations of knowledge and scienter.").

From whatever role, interest or perspective in litigation one examines the 1995 Reform Act, it is undeniable that, as the Second Circuit has observed, "[t]he landscape of securities fraud litigation has been transformed in recent years by the passage of the PSLRA." [8] *Novak,* 216 F.3d at 305. When all is said and done, Congress effectively promulgated a special pleading measure for gauging the sufficiency of complaints in securities fraud actions, allegations of scienter in particular, that is more stringent than that which, under the *Conley* doctrine, applies to other causes of action challenged on a motion to dismiss. *See Greebel,* 194 F.3d at 195. ("While under Rule 12(b)(6) all inferences must be drawn in plaintiff's favor, inferences of scienter [in § 10(b) actions] do not survive if they are merely reasonable, as is true when pleadings for other causes of action are tested by motion to dismiss under Rule 12(b)(6)."); *cf., Leslie Fay Cos. Sec. Litig.,* 871 F.Supp. 686, 694, n. 6 (S.D.N.Y.1995) ("Alleging facts raising a reasonable inference of intent meets that [scienter] standard.") (citing *Goldman,* 754 F.2d at 1070).

Read cumulatively, the relevant provisions of the 1995 Reform Act— the particularity demanded by Subsection (b)(1); the specificity of the 'strong inference' standard codified in Subsection (b)(2); the instruction of Subsection (b)(3)(A) to the courts to dismiss complaints that fail to meet the mandated strengthened pleading standards; and the automatic stay on discovery imposed by Subsection (b)(3)(B),— as a whole now compel judicial treatment of Rule 12(b)(6) motions to dismiss securities fraud complaints uniformly in a manner appreciably different from the divergent procedural practice in effect in many circuits before the PSLRA, and from the way such motions relating to many other causes of actions may still be handled.

Viewing them in tandem, these provisions signal Congress' intent to re-calibrate the balance in securities litigation, the adjustments tilting decidedly in the direction against easier pleadings and in favor of earlier dispositive rulings on the sufficiency of a challenged complaint. Manifest in the 1995 Reform Act is the mandate that courts assess the legal sufficiency of plaintiffs' securities fraud allegations according to what plaintiffs know at the time the complaint is filed, rather than what they wish to learn through discovery and recover from defendants merely by reason of commencing an action charging fraud. *See SG Cowen Sec. Corp. v. U.S. District court,* 189 F.3d 909, 912 (9th Cir. 1999).

A closer look at the history and abuses that produced the PSLRA evinces other procedural and policy effects occasioned by the reforms, consequences that run through the courts' consideration of the statute and amplify the underlying interpretive differences. These issues bear significantly on the motions at hand and how the Court should approach their disposition. Perhaps most far-reaching among the PSLRA's implications is the role of the court itself in administering the standards

---

**8.** For an early assessment of the effects of the PSLRA, see the 1997 report by the Securities Exchange Commission. Fed. Sec. L. Rep (CCH) Report Bull. 1763 (April 23, 1997). The Commission there indicates a decline in the number of securities litigation cases filed during the year immediately after the PSLRA's enactment. *See also Hazen* § 13.3.1. at 122 (2000 Pocket Part) ("The Reform Act's heightened pleading standards and discovery stay provisions appear to have been successful in making it more difficult for plaintiffs to bring securities law claims.").

now mandated by the law. By placing a higher premium on particularity in plaintiffs' assertions of fraud, exacting a stricter standard of pleading scienter and thereby raising the stakes on Rule 12(b)(6) motions to dismiss, the PSLRA also imposes a relatively higher burden on the court in securities fraud actions to render judgment at the pleading stage of a case on the basis of inquiries that embody both heightened quantitative and qualitative aspects.

First, the quantum of allegations specifying fraud must be sufficiently factual and particular to pass muster under Subsection (b)(1). And substantively, linked together contextually and weighed with reasonable inferences drawn in plaintiffs' favor, the facts pleaded must point *strongly* to an inference that defendants harbored intent to deceive, manipulate or defraud. These qualitative judgments entail a prophylactic design. The courts must, at an earlier stage of proceedings and on the basis of a less developed record, distinguish from among plaintiffs' claims the legally sufficient action from the solely extortionate, and divide the true victims from transparent mercenaries and opportunists. Sooner distinctions are also indicated from among defendants. This objective reflects the realities of securities fraud litigation, reaffirming that the marketplace houses both the manipulators and the manipulated, the perpetrators of fraud and deceit and those who are drawn, sometimes unwittingly, into actions—by other defendants as well as by plaintiffs.

In prompting speedier qualitative determinations, the PSLRA suggests the recognition of another reality. Allegations that a person acted deliberately to defraud or deceive, or engaged in conduct reflecting extreme departures from acceptable legal norms in connection with publicly regulated securities transactions affecting not just one or a handful of persons, but very large numbers of investors and markets, are grave charges that should not be treated lightly. As the Supreme Court has recognized, the operative terms § 10(b) and Rule 10b–5 employ—- "manipulative", "deceptive", "device", "scheme", "contrivance", "artifice", "to defraud"—are strong words. *See Hochfelder*, 425 U.S. at 197, 96 S.Ct. 1375. These terms may do more than sting the sensibilities of those so denounced. This legislative expression is laden with moral and pejorative meaning. As such, the impacts of accusations of intentional fraud may far exceed economic harm and mere vexation and inconvenience to the persons accused. Rather, the stigma associated with willful or egregious fraudulent behavior, even when published as mere unsubstantiated allegations, may work to impair reputations and extend in consequential chain reaction to other aspects of personal and business affairs.

For these reasons, to the extent the charges are fundamentally insufficient to state a claim, and name particular parties only to serve plaintiffs' tactical designs, defendants should not be put to the test of and burdened by defeating baseless charges only after full discovery or trial. By the same token, the implied ends the statute projects manifest that some plaintiffs often paint and taint with unduly and unfairly broad brush strokes. To encourage or tolerate unrestrained accusations of deception to be turned into sport and profit not only minimizes the perceived infamy and wrongfulness of fraud, but also depreciates the real hardships that unfounded charges visit upon the undeservedly maligned persons whose names and livelihoods may be placed in the balance.

The duties the courts must discharge in this respect at the Rule 12(b)(6) motion stage also reflect the relativism this Court referred to its decision on the Noteholders Action. *See* Decision and Order, *In re*

*Noteholders,* 2001 WL 740673, *3–4 (2001). To achieve the general ends of the PSLRA detailed here calls for drawing early distinctions of degree along the spectrum of culpability, recognizing the appropriate differentials which may define and distinguish the diverse roles played by the various actors who may have a part in any wrongful event, and enabling a separation of the innocent from the guilty, the active from the passive, the ordinary from the egregious. For example, depending on particular circumstances and varying relationships, the knowledge and intent possessed by executives of a corporation's senior management who set events in motion and drive the wrongful actions, may not equate on a scale of fault with that of outside parties situated farther downstream in time and space from particular transactions and representations. Implicit in the overall scheme of the 1995 Reform Act is that at a sooner stage in the proceedings than ordinarily would occur, the process should incorporate a means of sifting and exculpation designed to relieve from the burdens of litigation any parties who as a matter of law did not belong in the action in the first place.

To this end, and possibly of greatest moment, is that, if the implicit design of the PSLRA is correctly understood, these differential and inferential judgments, probably with higher incidence than earlier prevailed, now are more likely to devolve upon the court. This added judicial responsibility is no small matter. In fact, in fundamental ways it represents a profound departure from prior practice.

For, under pre-PSLRA philosophy of pleading that applied in some circuits, the rules permitted complaints to allege state of mind generally. This doctrine, grounded on the prescription of Rule 9(b) that pleadings of malice, intent, knowledge, and other condition of mind may be averred

generally (*see* Fed.R.Civ.P. 9(b)), leaned toward greater judicial generosity to the complaint and weighed in favor of allowing some general pleadings of scienter to survive motions to dismiss. *See, e.g., Glen-Fed,* 42 F.3d at 1547; *Cosmas,* 886 F.2d at 11 ("On a motion to dismiss, a court must read the complaint generously, and draw all inferences in favor of the pleader."). On this approach, judges at the pleading stage perform their vital function of preserving for the jury its traditional province as ultimate finder of fact. The evidentiary determinations of whether or not plaintiffs' contentions satisfy the standard of scienter, and what reasonable inferences about knowledge, motive and intent could be drawn from facts adduced, would be made with greater frequency by the court based on the more ample record produced on motions for summary judgment, or else by a jury on a comparable evidentiary standard.

Even assuming application of more stringent measures of particularity and scienter, Rule 9(b)'s relaxation of the specificity requirement for scienter could serve as a constraint which would enable complaints to survive dismissal, thereby raising the prospects that factual and inferential determinations ultimately could reach a finder of fact on a fuller record. *See, e.g., Leslie Fay,* 871 F.Supp. at 694, n. 6 (referring to Rule 9(b), indicated that a reasonable inference of intent is sufficient to satisfy the scienter standard) (citing *Goldman,* 754 F.2d at 1070).

The PSLRA, by contrast, declares that where the complaint alleges defendants acted with a "particular state of mind" the pleading must state *with particularity* facts giving rise to a *strong inference* that defendants acted with the required state of mind. *See* 15 U.S.C. § 78u–4(b)(2). This stricture cannot be read as other than a reversal of prior jurisprudence governing

the relevant point. Coupled with the mandate of Subsection (b)(3)(A) that non-complying pleadings are to be dismissed, and of Subsection (b)(3)(B) that discovery may not proceed until any motion to dismiss is decided, the message Congress delivered could not be more blunt or unambiguous. Succinctly put, as the First Circuit has noted:

> In the guise of tinkering with procedural requirements, Congress has effectively, for policy reasons, made it substantively harder for plaintiff to bring securities fraud cases, through the "strong inference" of scienter requirements.

*Greebel,* 194 F.3d at 196 n. 9.

At the very least, the 1995 Reform Act reflects an amber signal giving the courts, at minimum, added grounds to pause before sustaining the sufficiency of a § 10(b) securities fraud complaint challenged on Rule 12(b)(6) motions to dismiss. Beyond that threshold, the statute may be read to command heightened scrutiny of securities fraud pleadings and more finely-tuned judgments about the legal sufficiency of allegations of defendants' state of mind. In sum, the PSLRA suggests that on a motion to dismiss § 10(b) claims, judicial generosity should now yield some ground to particularity—mandates that suggest the likelihood of engendering more dispositive judicial determinations at the pleading stage of securities fraud litigation. At bottom, these measures and guideposts represent value-laden choices of national policy and priorities that fall well within Congress' prerogatives to legislate, and that it is the courts' task to effectuate.

## IV. DISCUSSION

The three motions to dismiss now before the Court, filed respectively by CIBC, D & T and the Outside Directors, are grounded on distinct theories. The discussion below addresses each motion separately.

## A. CIBC'S MOTION

### 1. Statute of Limitations

CIBC moves to dismiss on the ground that the one year statute of limitations expired before CIBC was named as a defendant. The Shareholders counter that they had no way to know CIBC was involved in the fraud until it was revealed when the SEC sued Drabinsky and Gottlieb on January 13, 1999. The Second Amended Complaint, which for the first time names CIBC as a party, was filed on January 11, 2000.

Section 9(e) of the Securities Exchange Act provides that "[n]o action shall be maintained to enforce any liability ... unless brought within one year after the discovery of the facts constituting the violation." 15 U.S.C. § 78i(e); *accord Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The statute of limitations begins to run once a plaintiff is put on either inquiry notice or constructive notice of the facts giving rise to his claim. *See Menowitz v. Brown,* 991 F.2d 36, 41 (2d Cir.1993). "[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *See Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 350 (2d Cir.1993).

Information that may be held to constitute inquiry notice includes any financial, legal, or other data, such as public disclosures in the media about the financial condition of the corporation and other lawsuits alleging fraud committed by the defendants, that provide the plaintiff with sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or

significant omissions involved in the sale of the securities. *See Dietrich v. Bauer*, 76 F. Supp.2d 312, 343 (S.D.N.Y.1999); *see also Brimo v. Corporate Express, Inc.*, 229 F.3d 1135, Fed. Sec. L. Rep. 91,236, 2000 WL 1506083, *2 (2d Cir. Oct. 6, 2000) (unpublished disposition). It is not necessary that this information put a plaintiff on notice of the entire wrongdoing. *Dodds*, 12 F.3d at 352. When the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures, the question of inquiry notice may properly be resolved on a motion to dismiss. *See Salinger v. Projectavision, Inc.*, 934 F.Supp. 1402, 1409 (S.D.N.Y.1996).

CIBC argues that Livent's August 1998 press releases or several news articles from various papers were sufficient to put the Shareholders on inquiry notice of CIBC's alleged involvement in the fraud perpetrated by Livent. The Court disagrees.

CIBC is not mentioned or directly implicated in any of Livent's press releases or in the media accounts. The August press releases revealed that Livent's financials were inaccurate and therefore clued the Shareholders that, to the extent CIBC's Fairness Opinion relied on those financials, that Opinion was also materially misleading. This circumstance by itself does not necessarily constitute notice suggesting a probability of CIBC's knowing misrepresentation or fraud. Moreover, one newspaper article made a reference to CIBC but does not hint at CIBC's involvement in the fraudulent transactions:

> Livent had at least two agreements—one with [CIBC] and the other with Dewlim—where it sold temporary royalty interests to its shows. And although that practice was perfectly legitimate, Livent was still obligated to inform its investors that it planned to cancel the shows.

*National Post*, dated June 1, 1999, Godnick Aff. Ex. N. On the record before it, the Court finds nothing prior to the SEC's civil suit against Drabinsky and Gottlieb on January 13, 1999 that was sufficient to give the Shareholders inquiry notice of CIBC's alleged fraud. Accordingly, CIBC's motion to dismiss on limitations grounds is denied.

### 2. *Failure to Plead Loss Causation*

CIBC argues that the Shareholders' Second Amended Complaint should be dismissed because it fails to link CIBC's allegedly fraudulent statements in the Fairness Opinion to the cause of Livent's collapse and Shareholders' investment losses. Rather, according to CIBC, the Shareholders have merely alleged that they relied on CIBC's statements in making their decisions to purchase Livent stock. In other words, while plaintiffs have alleged transaction causation, they have not adequately pleaded loss causation.

A claim for violations of § 10(b) and Rule 10b–5 requires a plaintiff to allege both transaction and loss causation. *See Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1494 (2d Cir.1992). Indeed, Congress codified the loss causation requirement with passage of the PSLRA. *See* 15 U.S.C. § 78u–4(b)(4)(section 10(b) plaintiff "shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which plaintiff seeks to recover damages"). Courts have "likened loss causation to the tort concept of proximate cause because, similar to proximate cause, in order to establish loss causation, a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation." *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 213 (2d Cir.2000)(internal quotation omitted).

■ This Court is persuaded that the Shareholders' allegations against CIBC satisfy the loss causation requirement. CIBC knew how much Livent had drawn on the term credit facility throughout the Class Period, and knew or was recklessly indifferent to the fact that Livent was encountering increasing difficulty generating sufficient amounts of revenue to continue operating, as demonstrated by its increasing reliance on the term credit facility. Drawing inferences in the Shareholders' favor, it was a reasonably foreseeable consequence that the value of Livent's common stock would decline precipitously when the misrepresentations in the Fairness Opinion, the fraudulent "Show Boat" royalty transaction, and Livent's true financial condition were revealed. CIBC's argument that "the obvious cause of Plaintiffs' economic harm is surely the alleged employment of the 'numerous and varied' fraudulent schemes that were 'carried out over an eight-year span' by other defendants" is unavailing. It is axiomatic in the jurisprudence of proximate cause that "[i]f the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that he will not be absolved from liability merely because other causes have contributed to the result." *Prosser* § 41 at 268.

On this basis, the Court finds that the Shareholders assert sufficient facts to satisfy the pleading standards of Rule 9(b) and the PSLRA and state a claim of liability under § 10(b).

CIBC was Livent's primary lender. Its relationship with Drabinsky and Gottlieb spanned several years. Consequently, a fair inference that may be drawn from the Shareholders' allegations is that CIBC had more than passing awareness of Livent's operations and financial difficulties. It was to repay Livent's debt to CIBC, then approaching $50 million as its financial condition deteriorated, that Livent entered into the Lynx $20 million transaction in June of 1998 and then issued Livent shares. In rendering the Fairness Opinion stating that the Lynx investment was fair, CIBC Wood Gundy did not disclose its own secret side agreement with Livent and its effects on Livent's true financial condition. To this extent, CIBC could be said to have benefitted in some concrete and personal way from the fraudulent conduct the Shareholders assert. *See Novak,* 216 F.3d at 307–08. Applying the *Novak* factors concerning defendants' (1) knowledge of facts or access to information contradicting their public statements, or (2) failing to review or check information they had a duty to monitor, or ignored obvious signs of fraud, the Shareholders' allegations support a finding, at the very least, of recklessness on the part of CIBC. *See id.* Moreover, insofar as the additional standard may be applicable, to the degree that CIBC's Fairness Opinion related to a transaction from which it stood to gain as one of the principal beneficiaries, CIBC's acts or omissions could be found to satisfy the motive and opportunity prong of the scienter test. *See* discussion *supra* Part III.C.1.

### B. *D & T's MOTION*

The Shareholders' sole claim against D & T is brought under § 10(b). D & T moves to dismiss for failure to plead scienter and to plead fraud with particularity.

#### 1. *Scienter*

The Second Amended Complaint does not rest on an assertion of the "motive and opportunity" prong of the standard for § 10(b) liability. *See* discussion *supra* Part III.C.1. Thus, the only issue is whether the Shareholders have alleged circumstantial evidence of conscious misbehavior

or recklessness on the part of D & T. *See id.*

The parties disagree about what documents the Court may look to in resolving this motion. In its moving papers, D & T draws from several sources outside the complaint, such as the criminal indictments of a number of Livent managers, the SEC complaint and investigative materials relating to Livent's collapse, and the Shareholders' earlier complaint in this action. The Shareholders maintain that these documents are improper for the Court's consideration.

■■■ According to the emerging rule in this Circuit, "a district court may consider the full text of a document partially quoted in the complaint where ... Plaintiffs have notice of the document's contents and the document is integral in drafting the complaint." *Bartley v. Artuz,* No. 95 Civ. 10161, 1999 WL 942425, at *4 (S.D.N.Y. Oct. 19, 1999) (citing *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 808–09 (2d Cir.1996) (recognizing the "somewhat uneven course" of Circuit case law and crediting more recent case law with permitting consideration of the full text of partially quoted documents in limited circumstances)); *see also In re Merrill Lynch Ltd. Partnerships Litig.,* 154 F.3d 56, 58 (2d Cir.1998); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991).

The Shareholders have notice of Livent's SEC filings, the SEC complaint, and the indictment by the U.S. Attorney's Office in the Southern District of New York relevant to this case, and themselves relied on those documents extensively in drafting their Amended Complaint. SH SAC ¶ 291. Therefore, the Court will consider those materials for the purposes of the motion at bar, to the same extent Judge Sweet did so in his ruling on the earlier motions. *See*

*Livent Shareholders I,* 78 F.Supp.2d at 218, n. 6.

This treatment of the issue is especially significant here. In the SH SAC, the Shareholders have artfully amended their pleadings to omit any reference to many of the secret side agreements that proved fatal to their earlier claims dismissed by Judge Sweet. Those side agreements feature prominently, however, in the SEC complaint, the indictments, and the Shareholders' own earlier complaint.

■■■ The Shareholders claim that the following allegations permit an inference that D & T was aware of the Livent managers' fraudulent scheme, or was at least reckless in ignoring the indicators of fraud: (1) the magnitude of the fraud; (2) the economic irrationality of the five fraudulent revenue-generating transactions; and (3) the "obvious" paper trail left by the transfer of incurred expenses from closed shows to ongoing shows. Actions taken by Drabinsky and Gottlieb to hide other, independent forms of fraud do not, the Shareholders claim, diminish D & T's liability grounded on these allegations.

### 2. *The Magnitude of the Fraud*

■■■ As Judge Sweet held in his earlier decision, the magnitude of the alleged fraud is properly considered in weighing whether the complaint meets the pleading standard for scienter. *See Livent Shareholders I,* 78 F.Supp.2d at 216–17. There, the court observed that

[c]ommon sense suggests that, all other things being equal, more opportunities should exist to discover a larger fraud than a smaller fraud, especially where, as here, the magnitude of the fraud was not accomplished by one fraudulent transaction of enormous monetary significance, but by countless small adjustments to the accounting entries on the

productions, several sizable loans concealed as sales of production rights, and the other manipulations described in the Complaint. Added together, of course, these manipulations were allegedly significant enough to cause the bankruptcy of [Livent].

*Id.* This Court similarly views the magnitude of the fraud and the totality of all the circumstances as relevant backdrop against which D & T's role in the events may be assessed in determining whether, in this full context, D & T's conduct may be considered sufficiently reckless to satisfy the scienter requirement of a § 10(b) claim. *See Novak,* 216 F.3d at 308.

### 3. *Livent's Fraudulent Revenue–Generating Transactions*

The Shareholders allege that D & T's recklessness and fraud can be inferred because D & T was fully aware of Livent's agreements of the contracts with Pace, Dewlim, and American Artists and therefore knew that Livent could not perform its contractual obligations in 1996 and 1997. The Shareholders further allege that D & T also knew that Messina opposed revenue recognition, yet D & T ultimately approved revenue recognition from those contracts for 1996 and 1997.

The Shareholders concede, however, that "the fees [from these agreements] were non-refundable and ... Livent had no obligation to make [productions] available for presentation." Plaintiffs Brief in Opposition to Outside Directors Motion to Dismiss at 9, 14–16. In addition, the Shareholders admit that Livent's representatives offered an interpretation of the contracts which would permit Livent to retain payments even if it did not produce any shows.

The Shareholders' allegation that revenue recognition from these transactions was improper because Livent had future performance obligations to stage the shows, SH SAC ¶¶ 52, 57, 86, 88, 92, is undermined by the Shareholders own admission and the contracts themselves. *See, e.g., Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1095 (2d Cir.1995) (sustaining dismissal of the complaint where "attenuated allegations" supporting a claim "are contradicted both by more specific allegations in the complaint and by facts of which [the court] may take judicial notice"); *Rapoport v. Asia Elecs. Holding Co.,* 88 F.Supp.2d 179, 184 (S.D.N.Y.2000) (granting motion to dismiss where the documents on which plaintiffs' securities fraud claim purport to rely contradict allegations in plaintiffs' complaint); *American Centennial Ins. Co. v. Seguros La Republica, S.A.,* No. 91 Civ. 1235, 1996 WL 304436 at *50 (S.D.N.Y. June 5, 1996) ("Allegations are not well pleaded if they are made indefinite or erroneous by other allegations in the same complaint[, or] ... are contrary to facts of which the Court will take judicial notice.") (quoting *Trans World Airlines, Inc. v. Hughes,* 449 F.2d 51, 63 (2d Cir.1973)).

Moreover, D & T's actions as regards the Dundee and Dewlin transactions—firmly resisting the insistence of Drabinsky and Gottlieb for revenue recognition, threatening to resign in one instance and obtaining an opinion of a third independent auditor in another—are not consistent with passive acquiescence in the face of knowledge that might support a finding of sufficient recklessness. The Court is not persuaded that under the PSLRA's heightened pleading standard of scienter as construed above, the Shareholders' allegations against D & T as regards the revenue-generating transactions are sufficient to create a strong inference of intentional misconduct or recklessness. *See Novak,* 216 F.3d at 307–08. At best, in this connection the Shareholders have alleged negligence on D & T's part.

In the absence of the side agreements, the non-refundable fees could properly be recognized under Canadian GAAP because they were not contingent on Livent's subsequent production of the shows. Accordingly, this Court concludes that the Shareholders' allegations are not sufficient to establish that D & T's decision to recognize the revenues from the transactions in question give rise to a strong inference of fraud.

### a. *The Dundee Transaction*

The Shareholders allege that when Chant of D & T opined that because of the Put Agreement, revenue from the Dundee transaction should not be recognized in the second quarter of 1997, Gottlieb provided D & T with a revised Dundee agreement which omitted the Put Agreement and represented that no consideration was required to procure its removal. D & T then advised that revenue should be recognized in the third quarter. Still, Gottlieb pressed for recognition during the second quarter, and presented confirmation from Dundee and an opinion of counsel which supported his position. D & T maintained refusal to accept the accounting in the second quarter, and Livent ultimately agreed to reverse the recognition (which totaled $6 million) but also undertook to "increase other revenue by $1.2 million . . . to maintain the appearance of profitability equal to the same period last year." SH SAC ¶ 75. Additionally, according to the Shareholders, D & T accepted a materially false press release, which stated that Livent had adjusted its accounting of the Dundee transaction to be consistent with U.S. GAAP. SH SAC ¶¶ 66–73, 220(b). In April 1998, D & T discovered another put agreement dated August 1997, and, when confronted, "Gottlieb expressly stated . . . that no such Put agreement or arrangement existed." SH SAC ¶ 79. D & T requested and received a written confirmation from Dundee that the Put had indeed been cancelled. SH SAC ¶ 78–79.

Judge Sweet dismissed similar claims asserted in the Shareholders' first amended complaint of D & T's fraud based on the revenue-generating transactions. *See Livent Shareholders I,* 78 F.Supp.2d at 212–18. This Court is not persuaded that the Shareholders' allegations against D & T as repleaded are any more sufficient to support a strong inference of recklessness or fraud under the applicable standards described above. Insofar as the Shareholders claim fraud based on D & T's alleged failure to identify problems with Livent's internal controls and accounting practices, such conduct does not constitute recklessness sufficient for § 10(b) liability. *See Novak,* 216 F.3d at 309 (citing *Decker* 681 F.2d at 120). Nor would claims of GAAP violations or accounting irregularities, standing alone, suffice to state a securities fraud claim. *See id.* (citing *Stevelman,* 174 F.3d at 84).

Here, in fact, the Shareholders' allegations confirm Gottlieb's efforts to conceal the fraudulent conduct from D & T. The claim that Livent's balance sheet was adjusted "to maintain the appearance of a quarter as profitable as the same period last year," SH SAC ¶ 75, does not raise any inference of recklessness or fraudulent intent, or indeed, even a violation of GAAP. Finally, the Shareholders' assertion that D & T "accepted" a fraudulent press release is vague and conclusory. The complaint makes no allegation that D & T had any role in either drafting or issuing the press release in question.

### b. *CIBC Wood Gundy Transaction*

The Shareholders concede that the secret CIBC side letter was concealed from D & T. SH SAC ¶ 264, 269. In addition, the agreement with CIBC expressly pro-

vided that CIBC's payment of the fee to Livent was non-refundable. SH SAC ¶ 87. Revenue recognition was therefore permissible under Canadian GAAP. On this basis, the Court finds insufficient grounds to support a strong inference of recklessness or fraud against D & T arising out of this transaction.

### 4. *Livent's Manipulation of Its Books and Records*

The Shareholders argue that D & T was reckless in failing to discover Livent's manipulations of its accounting books and records. Specifically, they allege that Livent transferred pre-production costs for shows to fixed asset accounts, erased expense entries and related liabilities from the general ledger, and transferred costs from one show currently running to another show that had not yet opened or that had a longer amortization period.

The Shareholders maintain that the adjustments were such that had D & T conducted a proper audit, the irregularities associated with these adjustments would have been discovered. Additionally, the Shareholders complain that although D & T detected several significant accounting irregularities through random audits, it failed to follow up, expand its sampling, and investigate thoroughly. Specifically the complaint assert that when D & T audited a random sampling of Livent accounts payable recorded in the first two months of 1998—about $2,000,000 in disbursements—it found that 25 percent of the total had improperly been pushed back into 1998 when they had, in fact, been incurred in 1997. D & T corrected every error it found, but given the magnitude of the misallocations uncovered, D & T should have been alerted to the possibility of deliberate manipulation and expanded its sampling. This Court considers D & T's failure to do so, upon discovering truly egregious accounting errors, to give rise to a strong inference of recklessness. These alleged actions, if sustained, reflect an overlooking of obvious signs, an egregious refusal to investigate the doubtful that extends well beyond mere failure to identify problems with Livent's internal controls or accounting practices. *See Novak*, 216 F.3d at 307–08; *Chill*, 101 F.3d at 269.

Similarly, D & T requested documentation to support a sampling of Livent's expenses assigned to fixed asset accounts—approximately 60 entries. During this sampling, the auditors found that the supporting documentation indicated that there had been fraudulent classification of construction costs in many cases. When D & T asked for further substantiation, Livent produced documentation only with respect to those items that could be substantiated, while ignoring the other requests. D & T repeatedly asked for the back-up for the remaining items, but to no avail. Ultimately, D & T simply stopped asking.

Standing alone, this charge may not rise to the level of recklessness. But, against a relevant backdrop of allegations concerning (1) the repeated difficulties D & T had encountered with the Inside Directors' dubious financial practices manifest in the revenue-generating transactions, (2) D & T's alleged failure to expand the sampling of the 1998 disbursements, and (3) assertions that even in the light of Livent's numerous questionable practices and D & T's expressed concerns, D & T nonetheless continually changed the account officers in charge of Livent's audits to new, inexperienced staff unfamiliar with Livent's prior history, a strong inference of recklessness may be drawn sufficient to withstand a motion to dismiss. Unlike D & T's responses relating the revenue-generating transactions, with regard to D & T strongly challenged Drabinsky and Gottlieb and repeatedly rejected their manipulations

until they either backed down or went around the auditors, D & T's actions and omissions in connection with Livent's manipulations of its books and records display acquiescence and passivity that, in this Court's reading of the pleadings, cross over the boundary of ordinary breaches of reasonable care into the zone of recklessness. Viewing these circumstances in their totality, the Court finds that D & T could be deemed to have failed to review or check information that it had a duty to monitor, or ignored obvious signs of fraud. *See Novak*, 216 F.3d at 308; *Rolf*, 570 F.2d at 47–48.

Accordingly, the Court grants D & T's motion to dismiss as to the Shareholders' claims regarding the revenue-generating transactions but denies the motion with respect to the allegations relating to Livent's manipulations of its books and records.

## C. *OUTSIDE DIRECTORS' MOTION*

### 1. *Section 10(b) Claims*

■ The Shareholders claims of fraud against the Outside Directors are not based on the "motive and opportunity" of the scienter requirement. Rather, the Shareholders seek to meet the "strong circumstantial evidence" prong by alleging that the Outside Directors knew of or recklessly disregarded several "red flags", namely: (a) that the Pace and Dewlim transactions required substantial performance in years subsequent to the year in which all revenue was recognized; (b) the "economic irrationality" of the Pace, American Artists, AMEX, and Dewlim agreements; (c) the discovery of the Dundee Put Agreement; (d) Drabinsky and Gottlieb's prior history at Cineplex Odeon; and (e) the magnitude of the fraud.

The same allegations that serve substantially to satisfy the pleading requirements as against the Drabinsky and Gottlieb—

namely, the double accounting system and the meetings Livent managers held in its service—weigh against a "strong inference" that the Outside Directors were aware of the fraud, since the double system of accounting books and records Livent's managers meticulously crafted left no "paper or transaction trail," SH SAC ¶ 112, and the Outside Directors, in connection with their involvement in Livent's audits, relied on the representations of management and on D & T.

On the pleadings before the Court, the Outside Directors were at worst negligent, not reckless, in failing to investigate the various Livent agreements the Shareholders cite as evidence of fraud. The Shareholders' pleadings are insufficient to demonstrate that the Outside Directors possessed knowledge of facts or access to information contradicting their public statements, or that they failed to review or check information they had a duty to monitor, or ignored obvious signs of fraud. *See Novak*, 216 F.3d at 308 (citing *Cosmas*, 886 F.2d at 12; *Rolf*, 570 F.2d at 47–48). Much of the wrongful conduct the Shareholders attribute to the Outside Directors may be deemed "fraud by hindsight", which is insufficient to satisfy a claim for recovery under § 10(b). *See Novak* 216 F.3d at 309 (citing *Stevelman*, 174 F.3d at 85).

The Shareholders nonetheless contend that the Livent revenue-generating agreements made no sense for the licensees. The agreements, however, in this Court's view of the allegations before it, are not so irrational as to raise "red flags" sufficient to create a strong inference of recklessness or fraudulent intent on the part of the Outside Directors. Moreover, if, as the Shareholders contend, Livent had the right to receive fees under these contracts whether or not the particular productions

were performed, the Outside Directors cannot be faulted for Livent's failure to defer the recognition of revenue over the life of each contract.

As for the Put Agreement, the Second Amended Complaint asserts that Gottlieb told the Outside Directors on at least two occasions that the Agreement had been cancelled. SH SAC ¶¶ 72–73, 78–79. It was, under the circumstances, neither "highly unreasonable" nor "an extreme departure from the standards of ordinary care" for the Outside Directors to believe that the Put had, in fact, been cancelled. *Chill,* 101 F.3d at 269.

The Shareholders additionally allege that when the Audit Committee agreed to remove the Dundee revenue from the second quarter, the parties concurred that Livent would make up $1.2 million of the quarter's lost revenue by "reversing an assortment of accrued liabilities." SH SAC ¶ 75. This allegation, however, is contradicted by Livent's public filings. Gottlieb's August 13, 1997 press release reported Livent's accounts payable and accrued liabilities at the conclusion of the second quarter (ended June 30, 1997) were $25,735,049. Roth Aff., Ex. L. As the Second Amended Complaint acknowledges (SH SAC ¶ 200), on September 8, 1997, Livent filed a Form 6–K with the SEC disclosing its revised results for the second quarter (the "1997 Second Quarter 6–K"). Like Gottlieb's August 13, 1997 Press Release, the 1997 Second Quarter 6–K reported that Livent's accounts payable and accrued liabilities at June 30, 1997 were $24,735,049. Roth Aff. Ex. N at 5. Thus, Livent's filings show that there were no reversals of accrued liabilities for the second quarter of 1997 following the August 1997 Audit Committee meetings. *See I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991).

Finally, the Shareholders also allege that the magnitude of the fraud suffices to satisfy the scienter requirement as to the Outside Directors. As set forth in the discussion above regarding D & T, this allegation, by itself, is insufficient to meet the standard. As Judge Sweet recognized in *Livent Shareholders I,* the scope of the fraud perpetrated here does raise questions regarding the Audit Committee's performance, particularly with regard to whether it fulfilled its defined responsibility to review "[Livent's] financial reporting procedures, internal controls and management information systems and the performance of [Livent's] external auditors." 78 F.Supp.2d at 219. As an example, Judge Sweet suggested that if the Outside Directors were aware that Livent's management information systems were capable of manipulating the accounts without leaving a paper trail, and the Outside Directors nonetheless failed, despite this awareness, to take steps to insure that such manipulations were not being performed—including through a review of the work of D & T—these acts or omissions might constitute recklessness sufficient to support an inference of scienter.

In their amended pleadings, the Shareholders have not supplied any additional material addressing Judge Sweet's point or otherwise asserted facts sufficient to sustain a finding that the Outside Directors' actions or omissions rose to the level of recklessness or intentional fraud.

### 2. *Section 20(a) Claims*

Judge Sweet dismissed the Shareholders' previous attempt at pleading a section 20(a) claim against the Outside Directors, concluding that the allegations of control status by reason of membership on the Livent Board or the Audit Committee alone was insufficient as a matter of law. *See Livent Shareholders I,* 78 F.Supp.2d at

221. Judge Sweet also held that to state a claim under § 20(a), a plaintiff was required to plead that each of the Outside directors were "in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person," and that the Shareholders had not alleged any particularized facts as to the Outside Directors' culpable participation in the fraud. *Id.* at 221–22 (citing *First Jersey*, 101 F.3d at 1472).

 The Shareholders second attempt at pleading § 20(a) liability, however, has not cured the defects Judge Sweet noted. This Court agrees with those courts that have held that an allegation that an audit committee member signed a fraudulent SEC filing raises a sufficient inference of control to survive a motion to dismiss. *See Jacobs*, 1999 WL 101772, at *17 (citing cases). An outside director and audit committee member who is in a position to approve a corporation's financial statements can be presumed to have "the power to direct or cause the direction of the management and policies of" the corporation, at least insofar as the "management and policies" referred to relate to ensuring a measure of accuracy in the contents of company reports and SEC registrations that they actually sign. 17 C.F.R. § 240.12b–2.

 Nevertheless, for the reasons discussed above with respect to the pleading standards applicable to §§ 10(b) and 20(a) claims, the Shareholders have not sufficiently alleged culpability on the part of the Outside Directors to sustain a § 20(a) claim. Accordingly, the Outside Directors' motion to dismiss the Shareholders' § 20(a) claim is granted.

## V. *ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that defendant CIBC Wood Gundy's motion to dismiss [Doc. 91–1] is DENIED; and it is further

**ORDERED** that defendant Deloitte & Touche's motion to dismiss [Doc. 86–1] is GRANTED in part and DENIED in part; and it is further

**ORDERED** that the motion of defendants Emerson, Goldfarb, and Taubman to dismiss [Doc. 89–1] is GRANTED.

**SO ORDERED.**